04-620

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 204

STATE OF MONTANA,

Plaintiff and Respondent,

v.

KINGSLEY ARIEGWE,

Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. BDC 2003-052D
Honorable Dirk M. Sandefur, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

William F. Hooks; Attorney at Law, Helena, Montana

For Respondent:

Hon. Mike McGrath, Montana Attorney General, Carol E. Schmidt,
Assistant Attorney General, Helena, Montana

Brant Light, Cascade County Attorney, Sue Weber,
Deputy County Attorney, Great Falls, Montana

Submitted on Briefs:  February 14, 2007

Decided:  August 16, 2007

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    A jury convicted Kingsley Ariegwe of attempted sexual intercourse without consent and unlawful transactions with children, and the District Court for the Eighth Judicial District, Cascade County, sentenced him to a term of imprisonment in the Montana State Prison.  The court also ordered Ariegwe to pay restitution totaling $14,234.66.  Ariegwe now appeals from his conviction and sentence.  We affirm in part, reverse in part, and remand for further proceedings.

¶2    The issues on appeal are as follows:

1.  Did the District Court err in denying Ariegwe's motion to dismiss for lack of a speedy trial?

2.  Did the District Court abuse its discretion in denying Ariegwe's motion for a new trial?

3.  Is the District Court's restitution order illegal?

### FACTUAL AND PROCEDURAL BACKGROUND

¶3    Ariegwe and a 15-year-old girl whom we will refer to as "K.M." met on January 15, 2003, in an Internet chat room devoted to romance in Montana.[1]  During the course of their online conversation, K.M. learned that Ariegwe was a 32-year-old male (he was actually 35) living in Great Falls.  K.M. informed Ariegwe that she also lived in Great Falls, and she directed him to the online profile associated with her screen name (online pseudonym).  The profile contained descriptive information—including K.M.'s age,

---

[1] For a basic description of Internet chat rooms, see *United States v. Johnson*, 376 F.3d 689, 690 n. 1 (7th Cir. 2004), and *Slattery v. United States*, 2005 WL 2416339 at *1 (N.D. Miss. Sept. 30, 2005).

which was listed as 15—and her picture. The two of them chatted for awhile, and Ariegwe gave K.M. his telephone number.

¶4 K.M. called Ariegwe the following evening (January 16) and again the next morning (January 17). In the course of these conversations, Ariegwe mentioned that he was divorced and that he had a 9-year-old son. K.M. informed Ariegwe that his age did not bother her "because [she] wasn't planning on doing anything with him." (K.M. later explained at Ariegwe's trial that because she was homeschooled and worked upwards of thirty hours a week as a babysitter, contact over the Internet was one way for her to make friends.) K.M. and Ariegwe also discussed alcoholic beverages, and K.M. disclosed that she had previously tried rum.

¶5 During the conversation on January 17, K.M. and Ariegwe arranged to meet later that morning at a local car dealership, where K.M. would be dropping off her mother's car for servicing. Upon arriving at the dealership, Ariegwe found K.M. in the waiting area. The two talked briefly and then decided to leave. Ariegwe drove K.M. to his house (which he shared with his ex-wife, his son, and his daughter), and upon arriving, they proceeded down to Ariegwe's living quarters in the basement. As for what transpired next, K.M.'s and Ariegwe's stories diverge dramatically.

¶6 According to K.M., Ariegwe went upstairs to get some glasses in which to serve them each an alcoholic beverage. Meanwhile, he had given her permission to play Nintendo, but K.M. was not able to get the game to work, so she just sat on the couch and waited. When Ariegwe came back downstairs, he poured K.M. a glass of liquor and she drank it. Ariegwe then sat next to K.M. on the couch and they watched television. After

a couple of minutes, Ariegwe began playing with K.M.'s hair and kissing her neck. K.M. told him to stop doing this, but he replied that she should give him a chance to show her that he's good with his tongue. Ariegwe then pulled K.M. onto his lap and, in so doing, bruised her left arm. He continued to kiss her neck and then pulled up her shirt and her bra and began kissing her breasts, notwithstanding K.M.'s insistence that he stop. He also stuck his hands between her legs and started rubbing her, after which he got on his knees on the floor and began biting in between her legs.

¶7     K.M. tried to push Ariegwe away. She told him that she wanted to leave, at which point he served her two more glasses of liquor, which she drank, as she later explained, "[b]ecause I was stupid." Thereafter, Ariegwe and K.M. stood up and he hugged her. She thought he was going to take her back to the car dealership, but instead he moved her over to the bed a short distance away where he laid her down, straddled her, removed most of her clothing, and performed oral sex—again, notwithstanding K.M.'s demand that he stop. Ariegwe then attempted several times to penetrate K.M. The first attempt occurred on the bed, but K.M. managed to slide out from underneath him. She fell on the floor, where he persisted to attempt to penetrate her, but K.M. kept sliding out from underneath him. Eventually, K.M. ended up at the bottom of the stairs, where Ariegwe finally penetrated her for about twenty seconds. He apparently pulled away before climaxing, which enabled K.M. to retrieve her clothing and get dressed. Ariegwe asked K.M. if she was okay, to which she replied, "No." He then got dressed and drove her back to the car dealership.

4

¶8    According to Ariegwe, by contrast, he did not have any sexual contact with K.M. Rather, upon arriving at the house, K.M. accompanied Ariegwe down to the basement and they sat down to talk. K.M. stated that she wanted an alcoholic beverage, so Ariegwe retrieved a bottle of liquor from the utility room, set the bottle on top of his entertainment center, and went upstairs to get drinking glasses. When he returned to the basement, he found K.M. sitting on the couch and playing the Nintendo game without his permission. He also observed that she was drinking directly from the bottle of liquor, was becoming "too playful" and "very hyper," and was "touching everything."

¶9    Ariegwe put the liquor away and brought K.M. back to the couch to talk and watch televsion. After about ten or twenty minutes, K.M. indicated that she wanted to leave, at which point the two of them walked over to the stairs. When K.M. took the first step, she staggered and fell backwards, prompting Ariegwe to grab K.M.'s arm to stabilize her. He led her up the stairs and then drove her back to the car dealership.

¶10    That afternoon, K.M. telephoned her best friend R.K. Although she did not disclose all of the details, K.M. confided to R.K. that she had had sex with a man in his thirties. Unbeknownst to K.M., this brief conversation was recorded on an answering machine at R.K.'s house. R.K.'s parents heard the conversation and contacted K.M.'s parents, who confronted K.M. the next morning. K.M. acknowledged a sexual encounter and stated that it had been involuntary.

¶11    K.M.'s parents contacted the police and took K.M. to the hospital for an examination. The police questioned K.M. at the hospital and then asked her to show them the house where she had been taken the previous morning (i.e., Ariegwe's house).

5

The police later obtained a warrant to search the residence. They seized two shot glasses from the upstairs sink and a bottle of rum, a computer, and bedding from the basement. They also went to K.M.'s home and retrieved the clothing she had worn while at Ariegwe's house. Meanwhile, Ariegwe's ex-wife contacted Ariegwe, who was at work at the time, and told him that the police were investigating his encounter with K.M. Ariegwe turned himself in at the police station later in the day (January 18), believing that he was in trouble only for providing an alcoholic beverage to a minor. The police arrested him and executed a body search warrant (which involves the collection of biological samples, such as blood, saliva, and hair). Ariegwe was then incarcerated for four days before he posted bond securing his release.

¶12 On February 7, 2003, the State filed an information charging Ariegwe with Count I, sexual intercourse without consent, a felony, in violation of § 45-5-503, MCA (2001), and Count II, unlawful transactions with children, a misdemeanor, in violation of § 45-5-623(1)(c), MCA (2001). Ariegwe pleaded not guilty to these charges on February 20, 2003, and the District Court set trial for May 13, 2003. Five postponements of the trial date ensued. (Each of the postponements is detailed under Issue One, *infra*.) Then, on December 16, 2003, the State filed an amended information adding an alternative charge under Count I—namely, *attempted* sexual intercourse without consent, a felony, in violation of §§ 45-4-103 and 45-5-503, MCA (2001)—to which Ariegwe pleaded not guilty on December 18, 2003. Five days later, the District Court vacated the existing January 5, 2004 trial date, since the parties were waiting for test results from the crime lab, and the court set a status hearing for January 22, 2004.

6

¶13 At the status hearing, defense counsel stated that he had received the crime lab reports, and the court and the parties then agreed on a March 1, 2004 trial date. Defense counsel also indicated, however, that he would be filing a motion to dismiss on speedy trial grounds. That motion was filed, as was a response by the State, and the District Court denied the motion following a hearing on February 17, 2004. The case then proceeded to trial on March 1 and concluded on March 3, 2004. On March 4, the jury acquitted Ariegwe of sexual intercourse without consent but convicted him of attempted sexual intercourse without consent and unlawful transactions with children.

¶14 On March 24, 2004, Ariegwe filed a motion for a new trial pursuant to § 46-16-702, MCA. He argued that he had been denied a fair trial because the prosecutor, during closing arguments, had inaccurately represented certain scientific evidence adduced at trial and because defense counsel, during trial, had failed to object to allegedly improper testimony by the State's trace hair and fiber examination expert. The State filed a response opposing the motion, and Ariegwe filed a reply. The District Court thereafter denied Ariegwe's motion, noting that the court had given a curative instruction to the jury concerning the prosecutor's inaccurate representations of the evidence, that the trace hair and fiber examination expert's allegedly improper testimony was of limited evidentiary value, and that there was ample remaining evidence upon which the jury could have found Ariegwe guilty of attempted sexual intercourse without consent and unlawful transactions with children.

¶15 The District Court sentenced Ariegwe on June 17, 2004, to fifty years in the Montana State Prison, with fifteen years suspended, and six months in the Cascade

County Detention Center, to run concurrently with the fifty-year sentence. The court also ordered Ariegwe to pay restitution as follows: $3,332.68 to K.M.'s family, $38.40 to the Montana State Crime Victims Compensation Unit, and $10,863.58 to EBMS Insurance Co., for a total of $14,234.66. This appeal followed.

¶16 Additional facts are provided below where relevant.

## DISCUSSION

¶17 ***Issue One. Did the District Court err in denying Ariegwe's motion to dismiss for lack of a speedy trial?***

**I. Our Framework for Analyzing Speedy Trial Claims**

¶18 Ariegwe's first contention on appeal is that the District Court erred in denying his motion to dismiss for lack of a speedy trial. We last clarified the framework by which we analyze speedy trial claims in *City of Billings v. Bruce*, 1998 MT 186, 290 Mont. 148, 965 P.2d 866, and we have consistently applied the *Bruce* test to such claims that have since come before this Court. In so doing, however, it has become apparent that certain aspects of the test are now in need of clarification or modification. Thus, we have determined at this juncture to revisit our approach to speedy trial claims, in particular because our doing so here does not affect the outcome of this appeal.

¶19 We begin in Part A by reviewing the speedy trial test articulated by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182 (1972), followed in Part B with a discussion of the framework we adopted in *Bruce*. We then set forth, in Part C, a detailed explanation of our revised speedy trial test, including several important rules for applying that test, after which we provide a summary and an outline of the

8

revised speedy trial test in Part D. Lastly, in Part E, we specify the rules pertaining to the timing of a motion to dismiss on speedy trial grounds and the corresponding ruling by the trial court.

### A. The *Barker v. Wingo* Balancing Test

¶20 A criminal defendant's right to a speedy trial is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article II, Section 24 of the Montana Constitution. *Klopfer v. North Carolina*, 386 U.S. 213, 222-26, 87 S. Ct. 988, 993-95 (1967); Mont. Const. art. II, § 24. In *Barker*, the United States Supreme Court set forth the approach under which the Sixth Amendment right to a speedy trial is to be evaluated. Specifically, the Court adopted "a balancing test, in which the conduct of both the prosecution and the defendant are weighed." *Barker*, 407 U.S. at 530, 92 S. Ct. at 2191-92. Acknowledging that such an approach "necessarily compels courts to approach speedy trial cases on an *ad hoc* basis," the Court identified "some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right": (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of the right to a speedy trial, and (4) the prejudice to the defendant as a result of the delay. *Barker*, 407 U.S. at 530, 92 S. Ct. at 2192; *see also Doggett v. United States*, 505 U.S. 647, 651, 112 S. Ct. 2686, 2690 (1992) (articulating these factors as four separate inquiries: "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result"). The Court explained that "these factors have no

9

talismanic qualities"; rather, "they are related factors and must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533, 92 S. Ct. at 2193.

¶21 In *State v. Sanders*, 163 Mont. 209, 516 P.2d 372 (1973), we noted that this Court had been considering "[e]ssentially the same factors" when analyzing speedy trial claims. *Sanders*, 163 Mont. at 213, 516 P.2d at 375; *accord Fitzpatrick v. Crist*, 165 Mont. 382, 388, 528 P.2d 1322, 1325 (1974) ("The United States Supreme Court and this Court have adopted essentially the same test to determine whether a trial is 'speedy.' "). Indeed, in *State v. Steward*, 168 Mont. 385, 543 P.2d 178 (1975), we explained that this Court had adopted the *Barker* factors in *State ex rel. Thomas v. District Court*, 151 Mont. 1, 438 P.2d 554 (1968), based on an earlier listing of those factors in *United States v. Simmons*, 338 F.2d 804 (2nd Cir. 1964). *See Steward*, 168 Mont. at 389, 543 P.2d at 181. Thus, following the *Barker* decision, we merely incorporated the Supreme Court's clarification of the four factors into our existing analytical framework. *See e.g. Sanders*, 163 Mont. at 213-15, 516 P.2d at 375-76; *Fitzpatrick*, 165 Mont. at 388-90, 528 P.2d at 1326; *Steward*, 168 Mont. at 389-94, 543 P.2d at 181-83; *State v. Keller*, 170 Mont. 372, 377-81, 553 P.2d 1013, 1016-19 (1976); *see also State v. Tiedemann*, 178 Mont. 394, 398, 584 P.2d 1284, 1287 (1978).

**B.    The *Bruce* Test**

¶22 Twenty-six years after *Barker* was decided, we observed that the four-factor balancing test had, unfortunately, led to "seemingly inconsistent results" nationwide. *Bruce*, ¶ 20; *see also Bruce*, ¶¶ 21-49 (identifying varied and inconsistent applications of

the test in our own caselaw). Therefore, seeking to achieve more consistent dispositions of speedy trial claims in Montana, we articulated a more structured method for analyzing such claims. As described below, we retained the four factors identified in *Barker*, but we incorporated objective, bright-line criteria into three of them, and we modified the function and importance each factor plays in the overall balancing.

¶23 Under Factor One (the length of the delay), we explained that we would continue to consider the length of the delay from the date of accusation (e.g., when the charges were filed) until the defendant's trial date "for the purpose of determining whether there is a basis for conducting a speedy trial analysis." *Bruce*, ¶ 55. We then established 200 days—irrespective of fault for the delay—as "the necessary length of time to trigger further speedy trial analysis." *Bruce*, ¶ 55. If less than 200 days have passed, then further speedy trial analysis is unnecessary. Thus, we fashioned Factor One as a threshold criterion; however, we indicated that the length of the delay would also be considered later in the analysis. *See Bruce*, ¶ 55.

¶24 Under Factor Two (the reason for the delay), we retained our approach of assigning responsibility or "fault" for the various periods of delay to either the State or the defendant. *Bruce*, ¶ 56. However, we then created a burden-shifting scheme based on the number of days of delay attributable to the State. Specifically, we stated that if less than 275 days of delay are attributable to the State, then the defendant has the burden (under Factor Four) to demonstrate that he or she *has* been prejudiced by the delay. *Bruce*, ¶ 56. Conversely, if 275 or more days of delay are attributable to the State, then a rebuttable presumption of prejudice arises and the State has the burden to overcome this

presumption by demonstrating that the defendant *has not* been prejudiced by the delay. *Bruce*, ¶¶ 39, 56. We explained that the rebuttable presumption of prejudice " 'mandates the conclusion [that the defendant has been prejudiced] in the absence of contradictory evidence.' " *Bruce*, ¶ 33 (quoting 22A C.J.S. *Criminal Law* § 695 (1985)); *see also Bruce*, ¶¶ 21-39 (discussing and reaffirming this presumption). Finally, we stated that if the State overcomes the presumption of prejudice, then the burden shifts to the defendant to demonstrate that he or she has been prejudiced by the delay, and the district court then weighs the evidence of each party. *Bruce*, ¶ 56.

¶25     Next, under Factor Three (whether the defendant timely asserted the right to a speedy trial), we stated that "if the right to speedy trial is invoked at any time prior to the commencement of trial, either by demanding a speedy trial, or by moving to dismiss for failure to provide a speedy trial, the third prong is satisfied." *Bruce*, ¶ 57.

¶26     Finally, under Factor Four (prejudice to the defendant), we indicated that we would continue to consider pretrial incarceration, anxiety and concern to the defendant, and impairment of the defense. *Bruce*, ¶¶ 58, 68. We noted, however, that "the importance of this factor and the degree of prejudice to establish denial of speedy trial will vary based upon other considerations, such as the length of delay and the reason for delay." *Bruce*, ¶ 58.

¶27     In sum, the *Bruce* framework requires (1) a determination that the length of the delay from the date of accusation until the defendant's trial date is at least 200 days, (2) a determination of who has the burden to demonstrate prejudice (the defendant) or to demonstrate lack thereof (the State) under Factor Four, (3) notation of whether the

defendant asserted the right to a speedy trial prior to the commencement of trial, and (4) an assessment of the proof offered by the defendant (to prove prejudice) or the State (to disprove prejudice) based on pretrial incarceration, anxiety and concern to the defendant, and impairment of the defense, with due consideration for the length of the delay and the reason for the delay. Although these modifications to our speedy trial test resulted in a more structured analytical approach, we recognize, for the reasons which follow, that our method of analysis has strayed considerably from the actual balancing approach envisioned in *Barker* and that it is necessary to reexamine certain features of our existing analytical framework.

¶28    First, both Ariegwe and the State refer to speedy trial analysis under *Bruce* as "a balancing of four factors." We too have used this characterization. *See e.g. State v. Hardaway*, 1998 MT 224, ¶ 13, 290 Mont. 516, ¶ 13, 966 P.2d 125, ¶ 13 ("[T]his Court recently established a four-part balancing test in [*Bruce*]."); *State v. Johnson*, 2000 MT 180, ¶ 14, 300 Mont. 367, ¶ 14, 4 P.3d 654, ¶ 14 ("We analyze and balance each of the four factors."); *State v. Blair*, 2004 MT 356, ¶ 14, 324 Mont. 444, ¶ 14, 103 P.3d 538, ¶ 14 ("[C]ourts must engage in a difficult and sensitive balancing process."); *State v. Doyle*, 2007 MT 125, ¶ 18, 337 Mont. 308, ¶ 18, 160 P.3d 516, ¶ 18 ("We engage in a lengthy and difficult balancing process."). Yet, the approach we adopted in *Bruce* does not actually involve a "balancing" of all four factors. Factor One is a threshold criterion; Factor Two determines who has the burden of proof under Factor Four; Factor Three, which is satisfied if the right to a speedy trial is invoked at any time prior to the commencement of trial, is properly characterized as a "non-weighted, 'either you asserted

the right or you did not' " criterion, *Bruce*, ¶ 81 (Leaphart, J., specially concurring); and Factor Four involves an assessment of prejudice to the defendant pursuant to the burden established under Factor Two. This approach more closely approximates a four-step analytical progression than it does a four-factor balancing test. Moreover, it channels the focus of the analysis to the issue of prejudice (Factor Four), rendering the reasons for the delay (Factor Two) and any efforts by the defendant to move the case along (Factor Three) relatively inconsequential.

¶29 The District Court's speedy trial analysis in the case at hand illustrates this point. The court noted that more than 200 days of delay had occurred, that at least 275 days of that delay were attributable to the State, and that Ariegwe had asserted his right to a speedy trial prior to the commencement of trial. Hence, the court focused on the issue of prejudice, ultimately concluding that the State had met its burden of demonstrating that Ariegwe had not been prejudiced by the delay and that he therefore had not been denied his right to a speedy trial. Factor Four, thus, seems to have been dispositive; indeed, the court's analysis does not reflect a "balancing" of Factor Four against the three other factors, thus prompting Ariegwe's contention on appeal that the District Court "gave undue weight to this factor, to the exclusion or minimization of the other factors."

¶30 Yet, the District Court's approach is consistent with the analytical progression set forth in ¶¶ 55-58 of *Bruce*, which contradicts the notion that speedy trial analysis under *Bruce* involves "a balancing of four factors." However, given that the right to a speedy trial is "necessarily relative" and "depends upon circumstances," *United States v. Ewell*, 383 U.S. 116, 120, 86 S. Ct. 773, 776 (1966) (internal quotation marks omitted), we

believe that an actual balancing of all four factors is preferred and, in fact, is more likely to produce an accurate assessment of a speedy trial claim than is an approach under which three of the factors function, essentially, as mere preludes to the fourth.

¶31 Second, based on the rebuttable presumption of prejudice articulated in *Bruce* and restated in several of our subsequent precedents, Ariegwe suggests that once the State has caused 275 days of delay, the defendant need not come forward with any proof that he or she has been prejudiced as a result of the delay unless the State rebuts the presumption of prejudice (citing *Blair*, ¶ 26, *Johnson*, ¶ 17, and *Bruce*, ¶ 56). This interpretation of the presumption is consistent with our explanation of rebuttable presumptions in *Bruce*:

> "A presumption . . . attaches definitive probative value to certain facts. If the presumption is conclusive, it mandates a particular conclusion; if it is rebuttable, *it mandates the conclusion in the absence of contradictory evidence*."

*Bruce*, ¶ 33 (ellipsis in original, emphasis added) (quoting 22A C.J.S. *Criminal Law* § 695 (1985)); *see also State v. Kipp*, 1999 MT 197, ¶ 25, 295 Mont. 399, ¶ 25, 984 P.2d 733, ¶ 25 ("[O]nce the presumption attached, it was not incumbent on the defendant to prove prejudice. It was incumbent on the State to disprove prejudice. Because it did not do so, the presumption of prejudice prevails."); *State v. Haser*, 2001 MT 6, ¶ 25, 304 Mont. 63, ¶ 25, 20 P.3d 100, ¶ 25 ("[O]nce the delay attributable to the State exceeds 275 days, . . . prejudice is presumed."). Yet, presuming prejudice based on nothing more than the State's failure to prove the contrary is not, in our view, an accurate basis on which to evaluate a speedy trial claim.

15

¶32     Lastly, we held in *Bruce* that so long as the defendant asserts the right to a speedy trial prior to the commencement of trial, he or she has satisfied the third prong of the *Barker* test and "further analysis of that prong is not only unnecessary, but inappropriate." *Bruce*, ¶ 48. For reasons we detail below, however, we are no longer of the view that further analysis under Factor Three is "unnecessary" and "inappropriate."

¶33     Accordingly, we take this opportunity to revisit the process by which speedy trial claims are to be analyzed by the courts of this State and to revise our analytical framework in several significant respects.

### C.     Our Revised Speedy Trial Test

¶34     At the outset, we reaffirm that *Barker*'s balancing approach is "the correct and most complete standard available to judge speedy trial questions." *State v. Tiedemann*, 178 Mont. 394, 398, 584 P.2d 1284, 1287 (1978). Furthermore, although the Supreme Court indicated in *Barker* that the factors which courts should assess when analyzing a speedy trial claim might be expressed in different ways, *Barker*, 407 U.S. at 530, 92 S. Ct. at 2192, we find the four factors suggested by the Supreme Court—the length of the delay, the reason for the delay, assertion of the right, and prejudice to the defendant— to be suitable for our method of speedy trial analysis.

¶35     However, while we are guided by *Barker*'s general approach for analyzing speedy trial claims, the test we articulate below is grounded in Article II, Section 24 of the Montana Constitution, which provides a speedy trial guarantee that is independent of the Sixth and Fourteenth Amendments to the United States Constitution. *See Buckman v. Montana Deaconess Hosp.*, 224 Mont. 318, 324, 730 P.2d 380, 384 (1986) ("Because the

16

federal constitution establishes the floor and not the apex of constitutional rights, state action may violate our Montana Constitution, but not violate any federal constitutional guarantee."). Accordingly, we may "give our own meaning" to *Barker*'s four factors. *State v. Britton*, 213 Mont. 155, 158, 689 P.2d 1256, 1258 (1984).

¶36 We now detail the inquiries a court is to make under each factor of the balancing test.

### 1. Factor One: The Length of the Delay

¶37 In *Barker*, the Supreme Court stated with respect to Factor One that "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530, 92 S. Ct. at 2192. In *Doggett v. United States*, 505 U.S. 647, 112 S. Ct. 2686 (1992), however, the Supreme Court clarified that Factor One "is actually a double enquiry." *Doggett*, 505 U.S. at 651, 112 S. Ct. at 2690. The Court explained as follows:

> Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay, since, by definition, he cannot complain that the government has denied him a "speedy" trial if it has, in fact, prosecuted his case with customary promptness. If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim. This latter enquiry is significant to the speedy trial analysis because . . . the presumption that pretrial delay has prejudiced the accused intensifies over time.

*Doggett*, 505 U.S. at 651-52, 112 S. Ct. at 2690-91 (citations omitted).

¶38 Thus, under the Supreme Court's approach, the first inquiry under Factor One— whether a speedy trial analysis has been triggered—is a threshold matter, while the

second inquiry under Factor One—the extent to which the delay stretches beyond the trigger date—is a matter to be weighed in the overall balancing. We agree with this approach and adopt it. Thus, consistent with the distinction explained in *Doggett*, and for the sake of clarity in the analysis, trial courts henceforth must address the length of the delay clearly, and first, as a threshold matter and then, if the speedy trial test has been triggered, as a factor to be weighed in the overall balancing.

### i. The 200-Day Threshold

¶39 Accordingly, the first question to be answered with every speedy trial claim is whether the interval between accusation and trial is sufficient to trigger the four-factor balancing test. This interval is measured without regard to fault for the delay. *Bruce*, ¶ 55; *State v. Collier*, 277 Mont. 46, 54, 919 P.2d 376, 382 (1996).

¶40 As for what constitutes a sufficient interval between accusation and trial, the Supreme Court stated in *Barker* that "because of the imprecision of the right to speedy trial, the length of delay that will [trigger a speedy trial analysis] is necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530-31, 92 S. Ct. at 2192. However, the Supreme Court also cautioned that "[n]othing we have said should be interpreted as disapproving a presumptive rule adopted by a court in the exercise of its supervisory powers which establishes a fixed time period within which cases must normally be brought." *Barker*, 407 U.S. at 530 n. 29, 92 S. Ct. at 2192 n. 29.

¶41 In *Bruce*, we established 200 days as "the necessary length of time to trigger further speedy trial analysis." *Bruce*, ¶ 55. We arrived at this number based on the varying lengths of delay we had considered sufficient (or insufficient) in our prior

18

decisions. *See Bruce*, ¶¶ 22-23. We believe that this length of time is still appropriate, given the reality of crowded court dockets throughout the State and certain built-in pretrial delays, such as reciprocal discovery; pretrial motions, appearances, and hearings (some of which are statutorily mandated); defense investigation; and obtaining the results of tests and analyses of evidence from the crime lab. It is true that the amount of delay that is customary is also a function of the complexity of the charged offense(s). *See Barker*, 407 U.S. at 531, 92 S. Ct. at 2192. However, for the sake of retaining a bright-line trigger date, we will address the complexity of the charged offense(s) under Factor Two (the reasons for the delay). Accordingly, we reaffirm the 200-day threshold: A speedy trial claim lacks merit as a matter of law if the interval between accusation and trial is less than 200 days (again, irrespective of fault for the delay).[2]

¶42 As for when the speedy trial clock begins to run, we stated in *State v. Longhorn*, 2002 MT 135, 310 Mont. 172, 49 P.3d 48, that "[t]he right of a defendant to a speedy trial commences when he becomes an accused." *Longhorn*, ¶ 22. We explained this concept in greater detail in *State v. Larson*, 191 Mont. 257, 623 P.2d 954 (1981):

> The right to a speedy trial is guaranteed to an "accused" by the Montana and United States constitutions. Consequently, the protection afforded by the guarantee is activated when a criminal prosecution has begun and extends to those persons who have been formally accused or charged in the course of that prosecution whether that accusation be by arrest, the filing of a complaint, or by indictment or information.

*Larson*, 191 Mont. at 261, 623 P.2d at 957-58; *accord State v. Morris*, 230 Mont. 311, 315, 749 P.2d 1379, 1381 (1988); *see also Dillingham v. United States*, 423 U.S. 64, 65,

---

[2] This rule does not apply to misdemeanor cases. *See* § 46-13-401(2), MCA.

96 S. Ct. 303, 303-04 (1975) (per curiam) (" '[I]t is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment.' " (quoting *United States v. Marion*, 404 U.S. 307, 320, 92 S. Ct. 455, 463 (1971)).  We reaffirm the rule set forth in *Larson* and add that the speedy trial clock begins to run at the earliest of the enumerated occurrences.[3]

¶43    Lastly, it bears repeating that the interval between accusation and trial runs not to the date on which the accused's speedy trial motion is considered by the court but, rather, to the scheduled trial date or the date on which a plea of guilty is entered, whichever date represents the date of disposition of the case.  *State v. Kipp*, 1999 MT 197, ¶ 9, 295 Mont. 399, ¶ 9, 984 P.2d 733, ¶ 9; *State v. Ellenburg*, 2000 MT 232, ¶ 16, 301 Mont. 289, ¶ 16, 8 P.3d 801, ¶ 16; *see also State v. Mooney*, 2006 MT 121, ¶ 15, 332 Mont. 249, ¶ 15, 137 P.3d 532, ¶ 15 (holding that the right to a speedy trial applies through sentencing).

---

[3] This rule must be extended logically to situations not involving "arrest, the filing of a complaint, or . . . indictment or information."  *See e.g. Bruce*, ¶ 55 (where Bruce's right to a speedy trial was allegedly violated on his appeal from city court for a trial de novo in district court, the speedy trial clock began on the date when the notice of appeal from city court was filed); *State v. Ray*, 2003 MT 171, ¶ 22, 316 Mont. 354, ¶ 22, 71 P.3d 1247, ¶ 22 (discussing this aspect of *Bruce*); *State v. Stanko*, 1998 MT 323, ¶ 28, 292 Mont. 214, ¶ 28, 974 P.2d 1139, ¶ 28 (the speedy trial clock began on the date the notice of appeal from justice court was filed); *State v. Price*, 2001 MT 212, ¶ 13, 306 Mont. 381, ¶ 13, 34 P.3d 112, ¶ 13 ("When the case involves a trial after an appeal from this Court, the length of delay is measured from the time remittitur is filed in the District Court until the trial date."); *State v. Olmsted*, 1998 MT 301, ¶ 61, 292 Mont. 66, ¶ 61, 968 P.2d 1154, ¶ 61 ("[W]hen a mistrial is declared, the speedy trial clock is reset and begins to run from the date of the mistrial."); *State v. Daniels*, 248 Mont. 343, 348-49, 811 P.2d 1286, 1289 (1991) (affirming the district court's determination that the speedy trial clock started when the defendant became an "accused" in the civil youth court proceeding, not when he became a "criminal defendant" subject to the jurisdiction of the district court after the charge was transferred there).

### ii. The Extent to which the Delay Stretches beyond the Trigger Date

¶44   The Supreme Court stated in *Doggett* that if the accused shows that "the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay," "the court must then consider, as one factor among several, the extent to which the delay stretches beyond the [trigger date]." *Doggett*, 505 U.S. at 651-52, 112 S. Ct. at 2690-91.   The significance of this inquiry, the Supreme Court explained, is that "the presumption that pretrial delay has prejudiced the accused intensifies over time." *Doggett*, 505 U.S. at 652, 112 S. Ct. at 2691.

¶45   Like the Supreme Court, this Court has recognized that "a delay sufficient to trigger further analysis also creates a presumption of prejudice." *Bruce*, ¶ 24.   Beyond this, however, our approach has diverged substantially from that of the Supreme Court. Whereas the Supreme Court characterizes the presumption of prejudice as something which "intensifies over time," *Doggett*, 505 U.S. at 652, 112 S. Ct. at 2691, this Court has followed a bright-line rule pursuant to which prejudice is either presumed or not presumed and the burden of presenting evidence on the issue of prejudice "shifts" from the accused to the State, *see Bruce*, ¶¶ 21, 39, 56.   Because we intend herein to adopt *Doggett*'s articulation of the role played by the presumption of prejudice in the overall balancing, we shall explain in detail how that presumption operated in our past cases and why we now conclude that the presumption of prejudice serves a more practical purpose under the approach set forth in *Doggett*.

¶46     The starting point for this discussion is *Barker*'s articulation of Factor One—in particular, the Supreme Court's statement that "[u]ntil there is some delay which is *presumptively prejudicial*, there is no necessity for inquiry into the other factors that go into the balance," *Barker*, 407 U.S. at 530, 92 S. Ct. at 2192 (emphasis added). Consistent with this language, this Court long followed the rule that a delay sufficient to trigger the speedy trial test is also sufficient to impose on the State the burden of showing that the accused has not been prejudiced by the delay or to create a presumption of prejudice that the State must then rebut.  Indeed, our pre-*Bruce* cases on this point are legion.[4]

---

[4] *See e.g. State v. Steward*, 168 Mont. 385, 389, 543 P.2d 178, 181 (1975); *State v. Keller*, 170 Mont. 372, 377, 553 P.2d 1013, 1017 (1976); *State v. Cassidy*, 176 Mont. 385, 389-90, 578 P.2d 735, 738 (1978); *State v. Tiedemann*, 178 Mont. 394, 399, 584 P.2d 1284, 1288 (1978); *State v. Puzio*, 182 Mont. 163, 166, 595 P.2d 1163, 1165 (1979); *State v. Harvey*, 184 Mont. 423, 433-34, 603 P.2d 661, 667 (1979); *State v. Worden*, 188 Mont. 94, 96-97, 611 P.2d 185, 186 (1980); *State v. Fife*, 193 Mont. 486, 489-90, 632 P.2d 712, 714-15 (1981); *State v. Ackley*, 201 Mont. 252, 255-56, 653 P.2d 851, 853 (1982); *State v. Bailey*, 201 Mont. 473, 479, 481, 655 P.2d 494, 497-98, 499 (1982); *State v. Kelly*, 203 Mont. 159, 160, 661 P.2d 26, 27 (1983); *State v. Chavez*, 213 Mont. 434, 441-42, 443, 691 P.2d 1365, 1370 (1984); *State v. Cutner*, 214 Mont. 189, 192, 692 P.2d 466, 467-68 (1984); *State v. Haskins*, 220 Mont. 199, 202, 714 P.2d 119, 121 (1986); *State v. Tilly*, 227 Mont. 138, 140-41, 737 P.2d 484, 486 (1987); *State v. Wombolt*, 231 Mont. 400, 402-03, 753 P.2d 330, 331 (1988); *State v. Bartnes*, 234 Mont. 522, 527, 764 P.2d 1271, 1275 (1988); *State v. Curtis*, 241 Mont. 288, 299, 787 P.2d 306, 313 (1990); *State v. Sunford*, 244 Mont. 411, 416, 796 P.2d 1084, 1087 (1990); *State v. Hall*, 244 Mont. 161, 165, 797 P.2d 183, 186 (1990); *State v. Heffernan*, 248 Mont. 67, 70-71, 809 P.2d 566, 568 (1991); *State v. Eklund*, 264 Mont. 420, 424, 872 P.2d 323, 326 (1994); *State v. Matthews*, 271 Mont. 24, 28, 894 P.2d 285, 287 (1995); *State v. Collier*, 277 Mont. 46, 54-55, 919 P.2d 376, 382 (1996); *State v. Tweedy*, 277 Mont. 313, 320, 922 P.2d 1134, 1138 (1996); *State v. Williams-Rusch*, 279 Mont. 437, 449-50, 928 P.2d 169, 176-77 (1996); *State v. Keating*, 285 Mont. 463, 471, 949 P.2d 251, 256 (1997); *cf. Fitzpatrick v. Crist*, 165 Mont. 382, 388, 528 P.2d 1322, 1326 (1974); *State ex rel. Sanford v. District Court*, 170 Mont. 196, 199-200, 551 P.2d 1005, 1007 (1976); *State v. Carden*, 173 Mont. 77, 85, 566 P.2d 780, 784 (1977); *State v. Freeman*, 183 Mont. 334,

¶47 In *Bruce*, we modified our approach by establishing the 275-day rule. Pursuant to this rule, the presumption of prejudice arises not on the 200-day trigger date but, rather, when 275 days of delay are attributable to the State. *See Bruce*, ¶ 56. Thus, there is an interval after the balancing test has been triggered—between 200 days of total delay and 275 days of delay attributable to the State—during which the presumption does not exist. However, once the presumption arises, it mandates the conclusion that the accused has been prejudiced by the delay unless it is overcome by contradictory evidence presented by the State. *See Bruce*, ¶ 33. In other words, the accused need not come forward with evidence of prejudice unless and until the State overcomes the presumption.

¶48 Upon further scrutiny of the Supreme Court's analysis in *Doggett*, the premise upon which our approaches to the presumption of prejudice rested is no longer compelling. *Barker*'s reference to "presumptively prejudicial" delay was not meant to place the burden of proof with respect to the issue of prejudice entirely on the State or to mandate a finding of prejudice absent evidence to the contrary. Indeed, the Supreme Court clarified in *Doggett* that "as the term is used in this threshold context, 'presumptive prejudice' does not necessarily indicate *a statistical probability* of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry." *Doggett*, 505 U.S. at 652 n. 1, 112 S. Ct. at 2691 n. 1 (emphasis added).

---

338, 599 P.2d 368, 371 (1979); *State v. Britton*, 213 Mont. 155, 162, 689 P.2d 1256, 1261 (1984); *State v. Palmer*, 223 Mont. 25, 27-28, 723 P.2d 956, 958 (1986); *State v. Waters*, 228 Mont. 490, 493, 743 P.2d 617, 619 (1987); *State v. Thompson*, 263 Mont. 17, 32, 865 P.2d 1125, 1134-35 (1993); *State v. Stewart*, 266 Mont. 525, 529-30, 881 P.2d 629, 632 (1994); *State v. Weeks*, 270 Mont. 63, 72, 891 P.2d 477, 482 (1995).

¶49    This does not mean, however, that presumptive prejudice plays no further role in the speedy trial analysis. To the contrary, a presumption of prejudice arises at the point when the balancing test is triggered; our cases simply misinterpreted the function of that presumption under *Barker*. Rather than establishing a bright-line point in time at which the accused is relieved of the burden of proving prejudice and the State takes on the burden of disproving prejudice, the presumption's significance is in its intensifying effect: the further the delay stretches beyond the trigger date, the more likely the delay has prejudiced the accused. *See Doggett*, 505 U.S. at 652, 112 S. Ct. at 2691 ("[T]he presumption that pretrial delay has prejudiced the accused intensifies over time."). In this respect, the length of the delay (Factor One) and the necessary showing of prejudice (Factor Four) are inversely related: as the delay gets longer, the quantum of proof that may be expected of the accused decreases, while the quantum of proof that may be expected of the State increases. Thus, the intensifying nature of the presumption of prejudice suggests simultaneously increasing (the State's) and decreasing (the accused's) burdens under Factor Four.

¶50    We have not heretofore considered the propriety of such an approach for purposes of our own speedy trial test. We do so now and conclude, for the reasons which follow, that an intensifying presumption of prejudice is a more practical application of presumptive prejudice than is *Bruce*'s bright-line 275-day rule.

¶51    For one thing, the point of the presumption of prejudice is not to relieve the accused of coming forward with evidence of prejudice; rather, it is simply an indicator of the *quantum* of evidence required: the less the delay extends beyond the trigger date, the

24

smaller the presumption of prejudice and, thus, the greater the accused's burden to show prejudice (and the smaller the State's concomitant burden to disprove prejudice). To be sure, there is a point in time at which prejudice may be presumed without affirmative proof thereof. *See Doggett*, 505 U.S. at 655, 112 S. Ct. at 2693 ("[W]e generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify."). However, we do not believe that that point is reached simply because the State is responsible—perhaps due to institutional forces beyond the prosecutor's control—for 275 days of delay.

¶52 Furthermore, presuming prejudice merely because the State has presented insufficient evidence to the contrary is not always justified and would, in some cases, provide the accused with an undeserved windfall. Indeed, a finding of prejudice based on nothing more than the State's failure of proof does not provide an accurate basis on which to weigh Factor Four against the other three factors in the overall balancing.

¶53 In this regard, we note that the accused generally has better access than does the State to evidence showing whether he or she has suffered oppressive pretrial incarceration, unduly prolonged anxiety and concern, and impairment of his or her ability to prepare an effective defense. The State, by contrast, is in the position of having to overcome a presumption by proving a negative—namely, that the accused's interests in being brought to trial promptly have *not* been infringed and that the defense has *not* been impaired—a task that we have recognized in some instances is all but impossible. *See e.g. State v. Keating*, 285 Mont. 463, 476, 949 P.2d 251, 259 (1997) ("From a practical standpoint, it would be virtually impossible for the State to rebut presumed prejudice

25

from an allegedly impaired defense without some showing by the defendant of actual impairment resulting in prejudice."); *Bruce*, ¶ 56 (noting "that direct proof of a defendant's state of mind may not always be possible and that the State's ability to anticipate the nature of the defendant's defense may vary from case to case"); *State v. Haser*, 2001 MT 6, ¶ 32, 304 Mont. 63, ¶ 32, 20 P.3d 100, ¶ 32 ("[S]ince it is nearly impossible for the State to prove that anxiety and concern do not exist, the State's burden to show a lack of anxiety becomes considerably lighter in the absence of more than marginal evidence of anxiety." (internal quotation marks omitted)); *State v. Boese*, 2001 MT 175, ¶ 16, 306 Mont. 169, ¶ 16, 30 P.3d 1092, ¶ 16 (observing that "impairment to one's defense is the most difficult form of speedy trial prejudice to prove" and, conversely, that "prejudice is difficult to *disprove*" (emphasis added, internal quotation marks omitted)).

¶54 It is true that the State might present evidence tending to establish the absence of prejudice indirectly. For instance, if the accused's own actions during the periods of delay suggest that he or she did not actually want to be brought to trial, then it seems less likely that he or she was actually prejudiced by the delay. *See e.g. State v. Keyes*, 2000 MT 337, ¶ 18, 303 Mont. 147, ¶ 18, 15 P.3d 443, ¶ 18 (observing that Keyes had fled from Montana's jurisdiction, had remained a fugitive from justice for nearly two years, and, during that time, had demonstrated absolutely no interest in obtaining a speedy trial, preserving evidence or witnesses, or advancing his legal defenses). Or, if previously unknown or unavailable exculpatory evidence came to light during the pendency of the trial, then it seems plausible that the delay worked to the accused's advantage. *Cf. State*

*v. Stuart*, 2001 MT 178, ¶ 23, 306 Mont. 189, ¶ 23, 31 P.3d 353, ¶ 23 (noting that "delay would have provided more—not less—time to locate [exculpatory] witnesses"). Alternatively, the State might demonstrate that all of the potential evidence in the case has been preserved and that all of the accused's potential witnesses are available to testify at trial and possess adequate memories of the events in question, which suggests that the accused's ability to present an effective defense has not been impaired. *See e.g. State v. Bowser*, 2005 MT 279, ¶¶ 22-23, 329 Mont. 218, ¶¶ 22-23, 123 P.3d 230, ¶¶ 22-23.

¶55     Nevertheless, requiring the State to disprove the considerations that make up the prejudice inquiry under Factor Four in order to overcome an otherwise mandated presumption of prejudice is, as a general rule, impractical.   More importantly, the accuracy of the overall balancing is enhanced when *both* the accused *and* the State present evidence on the issue of prejudice and neither party relies solely on the existence (the accused) or nonexistence (the State) of the presumption of prejudice (except, perhaps, in cases of unusually long delay).

¶56     For these reasons, we are not retaining *Bruce*'s 275-day rule in our speedy trial framework.  Instead, the presumption that pretrial delay has prejudiced the accused exists as of the 200-day trigger date for speedy trial analysis (at which point it is minimal) and intensifies (escalates) over time.  Furthermore, the accused should come forward with evidence tending to establish prejudice, the State should come forward with evidence tending to establish the contrary, and the court must weigh each party's evidence (or lack thereof) pursuant to the principles discussed above.  Thus, the State's failure to make a persuasive showing of no prejudice weighs more heavily against it in the overall

27

balancing when the delay is long, but such failure is of little weight where the delay is relatively brief. Likewise, a persuasive showing of prejudice by the defendant is more important where the delay is short and less important where the delay is long.

¶57 Before proceeding to Factor Two, three additional aspects of our *Bruce* decision bear on the instant discussion and, therefore, require attention. First, we discussed "the rebuttable presumption of prejudice" at length in *Bruce*. *See Bruce*, ¶¶ 21-39. After identifying reasons for presuming prejudice, and after acknowledging the Supreme Court's observations that affirmative proof of particularized prejudice is not essential to every speedy trial claim, *see Bruce*, ¶¶ 34-38, we concluded "that the rebuttable presumption of prejudice established by our earlier cases is not only the better public policy, but that it is *constitutionally required*," *Bruce*, ¶ 39 (emphasis added). Later in the opinion, we articulated "the point at which and the circumstances under which the presumption of prejudice will attach"—namely, when 275 or more days of delay are attributable to the State. *See Bruce*, ¶¶ 39, 56.

¶58 Although we are not retaining *Bruce*'s 275-day rule in our revised speedy trial framework, we do not intend this as an implicit overruling of our statement that the rebuttable presumption of prejudice is "constitutionally required." Rather, we conclude only that *Bruce*'s particular construct of that presumption is neither constitutionally required nor supported by the Supreme Court precedents from which it purportedly derives. For the reasons set forth above, the presumption of prejudice does not establish mutually exclusive burdens of proving and disproving prejudice but, instead, determines the necessary showings *both* parties must make under Factor Four. Under this

28

interpretation, both the accused and the State should come forward with evidence on this issue; but because "the presumption that pretrial delay has prejudiced the accused intensifies over time," *Doggett*, 505 U.S. at 652, 112 S. Ct. at 2691, the necessary showing by the accused of particularized prejudice decreases, and the necessary showing by the State of no prejudice correspondingly increases, with the length of the delay.

¶59    Second, we opined in *Bruce* that "[a]t some point in time (which we leave for future consideration) . . . the mere passage of time must necessarily be considered sufficient to conclusively establish denial of the right to speedy trial." *Bruce*, ¶ 56 (citing *Doggett* generally). Yet, *Doggett* does not preclude the State from attempting to rebut the presumption of prejudice, as would a *conclusive* presumption (*see Bruce*, ¶ 33). Indeed, in reaching the conclusion that Doggett was entitled to relief, the Supreme Court noted specifically that the government had not "persuasively rebutted" the presumption of prejudice in that case. *See Doggett*, 505 U.S. at 658, 112 S. Ct. at 2694.

¶60    Furthermore, nothing in *Doggett* supports the proposition that the mere passage of time may be sufficient to establish *denial of the right*. While the mere passage of time may give rise to a presumption of prejudice so compelling that the accused need not make any showing under Factor Four, the Supreme Court clarified that such presumptive prejudice "cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria." *Doggett*, 505 U.S. at 655-56, 112 S. Ct. at 2693. Indeed, the Supreme Court stated that generally a speedy trial claim would fail, "however great the delay," if the government had pursued the accused with reasonable diligence and the accused could not show specific prejudice to his or her defense as a result of the delay. *Doggett*, 505

29

U.S. at 656, 112 S. Ct. at 2693. Thus, it was a combination of lack of diligence on the part of the government and excessive delay that led the Supreme Court to conclude that Doggett was entitled to relief. *See Doggett*, 505 U.S. at 656-58, 112 S. Ct. at 2693-94. For this reason, it is doubtful that the mere passage of time could "conclusively" establish that the accused has been denied his or her right to a speedy trial.

¶61 Lastly, in our discussion of the significance of Factor One in the overall balancing, we have focused, thus far, on the relationship between the length of the delay (Factor One) and prejudice (Factor Four), explaining that the further the delay stretches beyond the 200-day trigger date, the more likely the delay has prejudiced the accused. This is not to say, however, that the extent of the post-trigger-date delay bears only on Factor Four. Indeed, the State's burden under Factor Two to provide valid justifications for the delay likewise " ' "increases with the length of delay." ' " *Bruce*, ¶ 26 (quoting *State v. Steward*, 168 Mont. 385, 389, 543 P.2d 178, 181 (1975), in turn quoting *United States v. Rucker*, 464 F.2d 823, 825 (D.C. Cir. 1972)). In other words, the further the delay stretches beyond the 200-day trigger date, the more compelling the State's justifications for the delay must be. *See e.g. Doggett*, 505 U.S. at 657, 112 S. Ct. at 2693 ("[T]he weight we assign to official negligence [in bringing an accused to trial] compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness."); *Rucker*, 464 F.2d at 825 ("When the delay approaches a year and a half, as in this case, the Government must provide a justification which convincingly outweighs the prejudice which can normally be assumed to have been caused the defendant."); *State v. Barker*, 261 Mont. 379, 383-84, 862 P.2d

30

1112, 1115 (1993) ("Because the State was unable to demonstrate either compelling circumstances to warrant such a lengthy delay, or that it diligently pursued bringing Barker's case to trial, we conclude that, in this instance, the delay weighs heavily against the State.").

¶62     Thus, to sum up the speedy trial inquiries under Factor One, the first question to be answered is whether the interval between accusation and trial is at least 200 days (irrespective of fault for the delay).  If not, then further analysis is unnecessary and the claim should be denied.  But if the interval is at least 200 days, then the four-factor balancing test is triggered and the court must proceed with a full analysis.  With respect to the second inquiry under Factor One, the court must consider the extent to which the delay (again, irrespective of fault for the delay) stretches beyond the 200-day trigger date.  The significance of this latter inquiry is twofold:  first, the presumption that pretrial delay has prejudiced the accused intensifies over time, and second, the State's burden under Factor Two to justify the delay likewise increases with the length of the delay.

### 2.     Factor Two: The Reasons for the Delay

¶63     Turning now to Factor Two, under this factor the court first identifies each period of delay in bringing the accused to trial.  Because the question is one of "delay," the court does not consider any actions taken by the State or the accused which do not result in a postponement of the trial date.

¶64     Second, the court attributes each period of delay to the appropriate party.  In this regard, "[a] defendant has no duty to bring himself to trial; the State has that duty." *Barker*, 407 U.S. at 527, 92 S. Ct. at 2190 (footnote omitted); *accord State v. Blair*, 2004

31

MT 356, ¶ 23, 324 Mont. 444, ¶ 23, 103 P.3d 538, ¶ 23 ("[A] defendant is under no obligation to ensure diligent prosecution of the case against him or to help the State avoid dismissal for failure to timely prosecute him."); *In re A.G.*, 2002 MT 111, ¶ 26, 309 Mont. 491, ¶ 26, 47 P.3d 831, ¶ 26 ("[I]t is up to the State to move the case towards prosecution."). Furthermore, "society has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest." *Barker*, 407 U.S. at 527, 92 S. Ct. at 2190; *see also Barker*, 407 U.S. at 519-21, 92 S. Ct. at 2186-87 (discussing "[the] societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused"). Accordingly, the State bears the burden of explaining the pretrial delays.

¶65 The Ninth Circuit reached the same conclusion in *McNeely v. Blanas*, 336 F.3d 822 (9th Cir. 2003), reasoning as follows:

> The Supreme Court has repeatedly held that the prosecutor and the court have an affirmative constitutional obligation to try the defendant in a timely manner and that this duty requires a good faith, diligent effort to bring him to trial quickly. *See Moore v. Arizona*, 414 U.S. 25, 26, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973) (stating that courts should inquire whether the state "discharge[d] its 'constitutional duty to make a diligent, good-faith effort to bring [the defendant to trial]' " (quoting *Smith v. Hooey*, 393 U.S. 374, 384, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969))); *Dickey v. Florida*, 398 U.S. 30, 38, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970) ("[T]he right to a prompt inquiry into criminal charges is fundamental and the duty of the charging authority is to provide a prompt trial.").
> Numerous lower courts have, thus, held that the prosecution bears the burden of explaining delay in bringing an accused to trial. *See e.g.*, *United States v. Brown*, 169 F.3d 344, 349 (6th Cir. 1999) (stating that government had the burden of proving that defendant was actually culpable in causing the delay by evading arrest on the indictment, or was aware of the issuance of the indictment and intentionally hid himself from law enforcement agents); *United States v. Graham*, 128 F.3d 372, 374 (6th Cir. 1997) (holding that the state has the burden to explain pretrial delay); *Jones*

*v. Morris*, 590 F.2d 684, 686 (7th Cir. 1979) (finding that where reason for 23-month delay did not clearly appear in the record, "the absence of any reason for the delay should weigh against the state"); *Morris v. Wyrick*, 516 F.2d 1387, 1390 (8th Cir. 1975) (stating that where the record does not demonstrate reason for the delay and the state has provided no reasonable explanation, the court will "assume that there is no justifiable reason and weigh this factor heavily against the state"); *Georgiadis v. Superintendent, Eastern Correctional Facility*, 450 F.Supp. 975, 980 (S.D.N.Y.), *aff'd*, 591 F.2d 1330 (2d Cir. 1978) (stating that where actions of the defendant do not account for entire period, "the responsibility for these unexplained delays should rest with the state"). Although *Barker* did not explicitly identify the burden of proof for pretrial delay, it refers to the reason for the delay as "the reason the government assigns to justify the delay." 407 U.S. at 531, 92 S.Ct. 2182. We likewise hold that the prosecution bears the burden of explaining pretrial delays.

*McNeely*, 336 F.3d at 826-27 (alterations in original). Any delay not demonstrated to have been caused by the accused or affirmatively waived by the accused, therefore, is attributed to the State by default. *See McNeely*, 336 F.3d at 827, and cases cited therein; *Bruce*, ¶¶ 60-63; *State v. Kipp*, 1999 MT 197, ¶ 16, 295 Mont. 399, ¶ 16, 984 P.2d 733, ¶ 16; *see also State v. Ellenburg*, 2000 MT 232, ¶¶ 29-31, 301 Mont. 289, ¶¶ 29-31, 8 P.3d 801, ¶¶ 29-31.

¶66 In attributing each period of delay, however, the court must bear in mind that delay requested by a particular party may be attributable to the other party. *See e.g. State v. Diaz*, 2006 MT 303, ¶¶ 32-33, 334 Mont. 479, ¶¶ 32-33, 148 P.3d 628, ¶¶ 32-33 (holding that delay requested by the State but necessitated by the accused's unlawful acts was attributable to the accused); *State v. Keyes*, 2000 MT 337, ¶¶ 13-14, 303 Mont. 147, ¶¶ 13-14, 15 P.3d 443, ¶¶ 13-14 (holding that the time associated with Keyes' application to this Court for a writ of supervisory control was attributable to the State, given that the necessity of the application and the delay occasioned by our consideration of the

application were due to the confusing nature of the charges under which the State had sought to prosecute Keyes).

¶67 Lastly, after identifying and attributing each period of delay in bringing the accused to trial, the court assigns weight to each period based on the specific cause and motive for the delay. This is necessary because the weight assigned to a particular period of delay will depend on the party's culpability in causing it. The following examples provided by the Supreme Court in *Barker* illustrate this point with respect to delay attributable to the State:

> A *deliberate* attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as *negligence* or *overcrowded courts* should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, *a valid reason*, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531, 92 S. Ct. at 2192 (emphases added, footnote omitted); *see also Strunk v. United States*, 412 U.S. 434, 436, 93 S. Ct. 2260, 2262 (1973) ("Unintentional delays caused by overcrowded court dockets or understaffed prosecutors are among the factors to be weighed less heavily than intentional delay, calculated to hamper the defense, in determining whether the Sixth Amendment has been violated.").

¶68 With respect to deliberate attempts by the prosecution to delay the trial versus overcrowded court dockets, our cases already require that these two types of delay be attributed to the State but weighed differently. In *State v. Blair*, 2004 MT 356, 324 Mont. 444, 103 P.3d 538, for example, we characterized delay inherent in the criminal justice system and caused by circumstances largely beyond the control of the prosecutor and the

34

accused as "institutional delay," and we attributed such delay to the State. *See Blair*, ¶ 19; *see also State v. Good*, 2002 MT 59, ¶ 26, 309 Mont. 113, ¶ 26, 43 P.3d 948, ¶ 26 ("[The accused] cannot be held responsible for the court's policy regarding the setting of trial dates and its management of its criminal caseload."); *Kipp*, ¶ 14 ("When a trial court, for its own reasons, vacates the trial date and does not set a new date, this delay is not attributable to the defendant."). However, we explained that institutional delay weighs less heavily against the State than does intentional delay, because institutional delay "is not one the State actively pursued," whereas intentional delay "exposes the defendant to 'oppressive tactics of the prosecution.' " *Blair*, ¶ 19.

¶69    As for negligence, the Supreme Court explained in *Doggett* that "[b]etween diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground." *Doggett*, 505 U.S. at 656-57, 112 S. Ct. at 2693. The Court stressed that "[a]lthough negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." *Doggett*, 505 U.S. at 657, 112 S. Ct. at 2693. We too have treated negligence (or lack of diligence) in bringing the accused to trial as an unacceptable reason for delay. *See e.g. State v. Tiedemann*, 178 Mont. 394, 399-405, 584 P.2d 1284, 1288-91 (1978); *State v. Fife*, 193 Mont. 486, 490, 632 P.2d 712, 715 (1981); *State v. Barker*, 261 Mont. 379, 383-84, 862 P.2d 1112, 1115 (1993); *Blair*, ¶ 24; *see also State v. Johnson*, 2000 MT 180, ¶ 12, 300 Mont. 367, ¶ 12, 4 P.3d 654, ¶ 12 ("As a general matter, the right to a speedy trial places on the State the burden of diligent prosecution at

all stages of a criminal proceeding."); *Kipp*, ¶ 16 (same); *State v. Longhorn*, 2002 MT 135, ¶ 22, 310 Mont. 172, ¶ 22, 49 P.3d 48, ¶ 22 ("If the accused is out of state, the State must act diligently and in good faith to acquire jurisdiction.").

¶70   Finally, besides delay caused by bad faith on the part of the prosecution, delay caused by negligence or lack of diligence, and delay caused by circumstances largely beyond the control of the prosecutor and the accused (e.g., overcrowded court dockets), there are "valid reasons" for delay attributable to the State.  For instance, if the charged offense is particularly complex, additional time to prepare for trial may be required.  *See Barker*, 407 U.S. at 531, 92 S. Ct. at 2192 ("[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."); *see also State v. Bretz*, 185 Mont. 253, 264, 269, 605 P.2d 974, 981-82, 984 (1979); *State v. Kills on Top*, 243 Mont. 56, 77, 80, 793 P.2d 1273, 1287, 1289 (1990).  Another "valid reason" is a missing witness.  *Barker*, 407 U.S. at 531, 92 S. Ct. at 2192.  In *Johnson*, for example, we observed that "the two continuances requested by the State in this trial were supported by good cause, namely, the unavailability of key prosecution witnesses on the scheduled trial dates."  *Johnson*, ¶ 20.  We therefore weighed such delay less heavily against the State in the overall balancing.  *See Johnson*, ¶¶ 20, 39.[5]

---

[5] We have stated that "[s]peedy trial delay will not be charged to the State when a material witness with 'valid reason' is not available."  *Diaz*, ¶ 32 (citing *State v. Tilly*, 227 Mont. 138, 142, 737 P.2d 484, 487 (1987)).  Yet, if the "valid reason" has nothing to do with the accused, then the delay is, in fact, charged to the State.  *See Barker*, 407 U.S. at 531, 92 S. Ct. at 2192; *Johnson*, ¶ 20.  Thus, to clarify our holdings in *Diaz* and *Tilly*, when the State requests a postponement of the trial because a material witness with "valid reason" is not available, the resulting delay is charged to the State unless that delay was brought about by the accused's unlawful acts, as was the situation in both *Diaz* and *Tilly*.

¶71 The crucial point of these distinctions and examples is that there are gradations of culpability in the delay attributed to the State—with bad-faith delay at one extreme and a valid reason, such as a missing witness, at the other extreme—which depend on the cause, the motive, and other surrounding circumstances. And the same is true of delay attributed to the accused. Delay caused by the accused to avoid being brought to trial or for tactical reasons weighs more heavily against him or her than does delay caused by a missing witness.

¶72 The function of Factor Two in the overall balancing, therefore, is no longer "to conclusively establish a burden shift for the determination of prejudice," *State v. Haser*, 2001 MT 6, ¶ 25, 304 Mont. 63, ¶ 25, 20 P.3d 100, ¶ 25; *see also State v. Doyle*, 2007 MT 125, ¶ 21, 337 Mont. 308, ¶ 21, 160 P.3d 516, ¶ 21 ("The court allocates the total number of days of delay between the parties for the purpose of determining which party carries the burden of proof under the prejudice factor."); *State v. Stanko*, 1998 MT 323, ¶¶ 29-30, 292 Mont. 214, ¶¶ 29-30, 974 P.2d 1139, ¶¶ 29-30 (stating that it was "immaterial" whether the delay at issue was attributed to the State or to Stanko, since the burden under Factor Four was on Stanko either way). Rather, this factor's significance is in the specific cause and culpability for each period of delay. Obviously, the more delay in bringing the accused to trial that is due to lack of diligence or other "unacceptable" reasons, the more likely the accused's speedy trial right has been violated. Likewise, the more delay caused by the accused for "unacceptable" reasons, the less likely the right has been violated. Lastly, because "the primary burden" to assure that cases are brought to trial is "on the courts and the prosecutors," *Barker*, 407 U.S. at 529, 92 S. Ct. at 2191, the

further the delay stretches beyond the 200-day trigger date, the more compelling the State's justifications for the delay must be (*see* ¶ 61, *supra*).

### 3. Factor Three: Assertion of the Right (hereinafter, The Accused's Responses to the Delay)

¶73 In *Bruce*, we held that "there is no magical time for assertion of the right to a speedy trial which should be weighed more favorably to the defendant than some other time"; so long as the accused asserts the right to a speedy trial at any time prior to the commencement of trial, he or she "has satisfied the third-prong of the *Barker* test and . . . further analysis of that prong is not only unnecessary, but inappropriate." *Bruce*, ¶ 48. In establishing this bright-line rule, we reasoned as follows:

> Analysis of when in a long period of delay, or how often during a long period of delay a defendant asserts the right to a speedy trial, makes an already subjective and arbitrary review process even more so. In the interests of consistency, predictability, and justice, our purpose should be to establish more objective criteria for prosecutors, defense lawyers, and district courts to evaluate speedy trial issues. The trend of subjectively evaluating the date on which each appellant has asserted his or her right to a speedy trial is the antithesis of that objective.

*Bruce*, ¶ 48.

¶74 It is true that analyzing when and how often the accused asserted the right to a speedy trial is a less objective approach than the "non-weighted, 'either you asserted the right or you did not' approach" we adopted in *Bruce* (*see Bruce*, ¶ 81 (Leaphart, J., specially concurring)). Moreover, there is indeed no "magical time" for assertion of the right. *See Barker*, 407 U.S. at 521, 92 S. Ct. at 2187 (noting that "there is no fixed point in the criminal process when the State can put the defendant to the choice of either exercising or waiving the right to a speedy trial"). That said, we conclude, for the

38

reasons which follow, that the overall accuracy of the balancing test is enhanced when the totality of the accused's responses to pretrial delays is considered.

¶75 The right to a speedy trial is "generically different" from any of the other rights enshrined in the Constitution for the protection of the accused. *Barker*, 407 U.S. at 519, 92 S. Ct. at 2186. One difference is that deprivation of the right may actually work to the accused's advantage. For instance, as the time between the commission of the crime and the trial lengthens, witnesses may become unavailable or their memories may fade; and if these witnesses support the prosecution, its case will be weakened, sometimes seriously so. *Barker*, 407 U.S. at 521, 92 S. Ct. at 2187.

¶76 Thus, as *Barker* makes clear, whether the accused actually wanted to be brought to trial promptly is an "important" consideration in ascertaining whether his or her right to a speedy trial has been violated. *Barker*, 407 U.S. at 534, 92 S. Ct. at 2194. Indeed, the fact that Barker seemingly did not want to be tried was the primary factor that counterbalanced the "extraordinary" delay of over five years between his arrest and trial. *See Barker*, 407 U.S. at 533-36, 92 S. Ct. at 2193-95. It is not always readily apparent whether the accused actually wanted a speedy trial, but some useful indicators identified in *Barker* are whether and how the accused asserted the speedy trial right, *see Barker*, 407 U.S. at 531, 92 S. Ct. at 2192, the frequency and force of the accused's objections to pretrial delays, *see Barker*, 407 U.S. at 529, 92 S. Ct. at 2191, and the reasons for any acquiescence by the accused in pretrial delays, *see Barker*, 407 U.S. at 534-36, 92 S. Ct. at 2194-95.

¶77    For instance, the Supreme Court observed that Barker initially acquiesced for tactical reasons in most of the prosecution's motions to continue; but once it became clear to Barker that he had lost his tactical gamble, he began to object to further continuances. *See Barker*, 407 U.S. at 534-36, 92 S. Ct. at 2194-95. On these facts, the Supreme Court concluded that Barker had not been deprived of his right to a speedy trial:

> We do not hold that there may never be a situation in which an indictment may be dismissed on speedy trial grounds where the defendant has failed to object to continuances. There may be a situation in which the defendant was represented by incompetent counsel, was severely prejudiced, or even cases in which the continuances were granted *ex parte*. But barring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial.

*Barker*, 407 U.S. at 536, 92 S. Ct. at 2195; *see also Barker*, 407 U.S. at 536-37, 92 S. Ct. at 2195 (White, J., concurring) ("Although the Court rejects [Barker's] speedy trial claim . . . , it is apparent that had Barker not so clearly acquiesced in the major delays involved in this case, the result would have been otherwise.").

¶78    The accused's various responses to delays, aside from providing some insight into whether he or she actually wanted to be brought to trial promptly, also serve as a useful gauge of the weights the court should assign to the other three factors in the balancing:

> Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.

*Barker*, 407 U.S. at 531-32, 92 S. Ct. at 2192-93.

¶79     Thus, Factor Three serves an important role in the balancing test by providing insight into whether the accused actually wanted a speedy trial and what weights the court should assign to the other three factors in the analysis.  For this reason, we are departing from the non-weighted, "either you asserted the right or you did not" approach of *Bruce*.  We hold that under Factor Three, the court must evaluate the accused's responses to the delay—i.e., his or her acquiescence in and objections to pretrial delays.  (An objection to delay could take the form of a motion to dismiss on speedy trial grounds, an objection to a motion by the prosecution for a continuance, a motion to compel requested discovery, etc.)  The sum of this evaluation—i.e., the totality of the accused's various responses to the delays in bringing him or her to trial—should then be considered together with the other three factors of the balancing test.

¶80     We caution, however, that we are not suggesting that the accused should complain early and often.  The timing and number of instances in which the accused objects to pretrial delay are not talismanic.  Indeed, a pro forma motion to dismiss on speedy trial grounds is itself only marginal evidence of a desire to be brought to trial.  At the same time, however, acquiescence in delay requested by the prosecutor is not conclusive evidence of a desire *not* to be brought to trial.  Rather, the accused's various responses to the delays must be evaluated based on the surrounding circumstances—such as the timeliness, persistence, and sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct (as that conduct bears on the speedy trial right), and so forth.  *See United States v. Loud Hawk*,

474 U.S. 302, 314, 106 S. Ct. 648, 655-56 (1986) (noting that the accused's assertion(s) of the speedy trial right "must be viewed in the light of [his or her] other conduct").

¶81    Thus, a situation in which the accused's pretrial conduct has been consistent with a sincere desire to be brought to trial promptly would be weighed differently than a situation in which the accused has objected repeatedly to pretrial delays but, at the same time, has filed indisputably frivolous pretrial motions that necessitated postponements of the trial date. *See e.g. Loud Hawk*, 474 U.S. at 314-15, 106 S. Ct. at 656 (observing that while the defendants were making a record of their speedy trial claims in the district court, they also filled that court's docket with repetitive and unsuccessful motions). Likewise, a situation in which the accused has acquiesced in a well-founded request by the prosecution to continue the trial would be weighed differently than a situation in which the circumstances demonstrate that the accused acquiesced in long delay in order to gain a tactical advantage. *See e.g. Barker*, 407 U.S. at 535, 92 S. Ct. at 2194 ("[T]he record strongly suggests that while he hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges, [Barker] definitely did not want to be tried."). Finally, a situation in which the accused knowingly failed to object to delay would be weighed differently than a situation in which the accused was unaware that he had been charged with a crime. *See e.g. Doggett*, 505 U.S. at 653, 112 S. Ct. at 2691 (noting that Factor Three would have weighed heavily against Doggett had he known of the indictment); *Barker*, 407 U.S. at 529, 92 S. Ct. at 2191 (observing that a court may attach a different weight to a situation in which the accused knowingly failed

to object as opposed to a situation in which his attorney acquiesced in long delay without adequately informing his client).

¶82     We note here that the court may not infer that the accused did not want a speedy trial *solely* because he or she did not object to pretrial delay often or at all.  For one thing, *Barker* does not stand for such an inference.  In concluding that Barker did not want a speedy trial, the Supreme Court relied on corroborating facts:  counsel's concessions to this effect during oral argument, *see Barker*, 407 U.S. at 535, 92 S. Ct. at 2194, and Barker's apparent goal of gaining a tactical advantage, *see Barker*, 407 U.S. at 535-36, 92 S. Ct. at 2194-95.  Furthermore, such an inference would conflict with the fact that while the accused has "some responsibility" to object to pretrial delay, *see Barker*, 407 U.S. at 529, 92 S. Ct. at 2191, he has "no duty to bring himself to trial," *Barker*, 407 U.S. at 527, 92 S. Ct. at 2190.  Thus, failure to object to pretrial delay does not, by itself, establish that the accused did not want a speedy trial or that the speedy trial right has not been violated. *See Barker*, 407 U.S. at 536, 92 S. Ct. at 2195 ("We do not hold that there may never be a situation in which an indictment may be dismissed on speedy trial grounds where the defendant has failed to object to continuances.").  At the same time, however, an absence in the record of any objections to delay will make it difficult for the accused to prove that he or she was denied a speedy trial.  *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193.

¶83     In a similar vein, the court may not infer waiver of the speedy trial right based on silence or inaction on the part of the accused.  In *Barker*, the Supreme Court explicitly rejected the rule, followed by a number of courts at the time, under which "a defendant waives any consideration of his right to speedy trial for any period prior to which he has

not demanded a trial." *Barker*, 407 U.S. at 525, 528, 92 S. Ct. at 2189, 2191. Among other things, the Court pointed out that "waiver" is "an *intentional* relinquishment or abandonment of a known right or privilege" and that courts "should not presume acquiescence in the loss of fundamental rights." *Barker*, 407 U.S. at 525-26, 92 S. Ct. at 2189 (emphasis added, internal quotation marks omitted).

¶84    In sum, Factor Three is no longer a procedural formality. Rather, this factor serves as an indicator of whether the accused actually wanted a speedy trial, which in turn informs the inquiry into whether there has been a deprivation of the right to a speedy trial. Factor Three also serves as a useful gauge of the weights the court should assign to the other three factors in the balancing.

¶85    Under Factor Three, therefore, the court must evaluate, based on the surrounding circumstances, the accused's various responses to the delays in bringing him or her to trial. The sum of this evaluation—i.e., the totality of the accused's responses—should then be considered together with the other three factors of the balancing test. For instance, conduct evidencing a sincere desire to be brought to trial promptly weighs in favor of the accused in the overall balancing, whereas conduct demonstrating a desire to avoid trial weighs against the accused in the overall balancing. Furthermore, in the analysis of prejudice under Factor Four, the court may take account of the timeliness and persistence of the accused's objections to pretrial delay—though, as explained above, the number of such objections does not equate with the degree of actual prejudice suffered. Finally, because the pertinent focus here is on the totality of the accused's various responses to pretrial delays, and not simply whether and when he or she filed a motion to

dismiss on speedy trial grounds, we are abandoning the "Assertion of the Right" label and henceforth will refer to Factor Three as "The Accused's Responses to the Delay."

### 4.    Factor Four: Prejudice to the Accused

¶86    Lastly, under Factor Four, the court inquires into whether the accused has been prejudiced by the delay.  Because the speedy trial guarantee "does not purport to protect a defendant from *all* effects flowing from a delay before trial," *Loud Hawk*, 474 U.S. at 311, 106 S. Ct. at 654 (emphasis added), prejudice should be assessed "in the light of the interests of defendants which the speedy trial right was designed to protect," *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193.

¶87    Two such interests are minimizing impairment of liberty and shortening disruption of life:

> The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

*United States v. MacDonald*, 456 U.S. 1, 8, 102 S. Ct. 1497, 1502 (1982).  A third interest is " 'limit[ing] the possibilities that long delay will impair the ability of an accused to defend himself.' " *Smith v. Hooey*, 393 U.S. 374, 377-78, 89 S. Ct. 575, 577 (1969) (quoting *United States v. Ewell*, 383 U.S. 116, 120, 86 S. Ct. 773, 776 (1966)).

¶88    The Supreme Court has expressed these interests as follows:  (i) to prevent oppressive pretrial incarceration, (ii) to minimize anxiety and concern of the accused, and (iii) to limit the possibility that the defense will be impaired by dimming memories and loss of exculpatory evidence.  *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193; *Doggett*, 505

45

U.S. at 654, 112 S. Ct. at 2692. We recognized these same three considerations in *Bruce*, *see Bruce*, ¶¶ 19, 56, 58, and we now reaffirm them as the pertinent considerations when evaluating whether the accused has been prejudiced by the delay. We also reaffirm that prejudice may be established based on "any or all" of these considerations. *State v. Johnson*, 2000 MT 180, ¶ 23, 300 Mont. 367, ¶ 23, 4 P.3d 654, ¶ 23.

### i.      Prevent Oppressive Pretrial Incarceration

¶89     The first interest—preventing oppressive pretrial incarceration—reflects the "core concern" of the speedy trial guarantee: "impairment of liberty." *Loud Hawk*, 474 U.S. at 312, 106 S. Ct. at 654. In *Barker*, the Supreme Court observed:

> The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time. Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense. Imposing those consequences on anyone who has not yet been convicted is serious. It is especially unfortunate to impose them on those persons who are ultimately found to be innocent.

*Barker*, 407 U.S. at 532-33, 92 S. Ct. at 2193 (footnotes omitted).

¶90     In assessing whether the pretrial incarceration in a given case is "oppressive," the court must consider all of the circumstances of the incarceration. Foremost among these is duration, given that one of the purposes of the speedy trial guarantee is to ensure that the prosecution " 'will move with the dispatch that is appropriate to assure [the accused] an early and proper disposition of the charges against him,' " *MacDonald*, 456 U.S. at 7, 102 S. Ct. at 1501 (quoting *United States v. Marion*, 404 U.S. 307, 313, 92 S. Ct. 455, 459 (1971)), and thereby "minimize the possibility of lengthy incarceration prior to trial,"

46

*MacDonald*, 456 U.S. at 8, 102 S. Ct. at 1502. *See also State v. Blair*, 2004 MT 356, ¶ 28, 324 Mont. 444, ¶ 28, 103 P.3d 538, ¶ 28 (concluding that "the fact of 342 days of pretrial incarceration suffices to establish this element in this case"). Thus, the longer the pretrial incarceration, the more likely it has been oppressive and the more likely the accused has been prejudiced by the delay.

¶91    At the same time, however, while justice should be administered with dispatch, " 'the essential ingredient is orderly expedition and not mere speed.' " *Marion*, 404 U.S. at 313, 92 S. Ct. at 459 (alteration omitted) (quoting *Smith v. United States*, 360 U.S. 1, 10, 79 S. Ct. 991, 997 (1959)). Thus, the complexity of the charged offense(s) is also relevant here. As noted above, the Supreme Court observed in *Barker* that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531, 92 S. Ct. at 2192. Likewise, the length of the pretrial incarceration that is "oppressive" is less for a relatively simple offense than it is for a complex charge.

¶92    Another pertinent consideration is any misconduct on the part of the accused directly related to the pretrial incarceration. For instance, if the accused has demonstrated a likelihood to flee the jurisdiction of the court, *see e.g. State v. Keyes*, 2000 MT 337, ¶ 18, 303 Mont. 147, ¶ 18, 15 P.3d 443, ¶ 18 ("As to any prejudicial effects of Keyes' lengthy pretrial incarceration, there can be no doubt in this case that a high bail and resulting incarceration were necessary in light of . . . his demonstrated ability and willingness to abscond from justice."), or if the accused has engaged in misconduct while incarcerated awaiting trial, *see e.g. State v. Ellenburg*, 2000 MT 232,

¶ 37, 301 Mont. 289, ¶ 37, 8 P.3d 801, ¶ 37 ("Ellenburg's incarceration was the result of . . . [his] misconduct while incarcerated."), thus necessitating confinement, then it is less likely that the incarceration was oppressive. In a similar vein, the fact that the accused was incarcerated on a separate charge while awaiting trial on the instant charge informs the issue of oppressiveness. *See State v. Highpine*, 2000 MT 368, ¶ 26, 303 Mont. 422, ¶ 26, 15 P.3d 938, ¶ 26, and cases cited therein; *State v. LaGree*, 2007 MT 65, ¶¶ 24-26, 336 Mont. 375, ¶¶ 24-26, 154 P.3d 615, ¶¶ 24-26, and cases cited therein. We note, however, that while the fact of incarceration on a separate charge is relevant, it is not dispositive. *See Smith v. Hooey*, 393 U.S. 374, 378, 89 S. Ct. 575, 577 (1969).[6]

¶93    Lastly, the conditions of the incarceration are relevant in assessing oppressiveness. *See Wells v. Petsock*, 941 F.2d 253, 257 (3rd Cir. 1991) (observing that "[a]ll pretrial detention is not equally oppressive" and that "the seriousness of a deprivation of liberty due to pretrial incarceration will vary with the conditions of the defendant's confinement"); *see also State v. Johnson*, 2000 MT 180, ¶¶ 27-29, 300 Mont. 367, ¶¶ 27-

---

[6] In *Hooey*, the Supreme Court explained:

At first blush it might appear that a man already in prison under a lawful sentence is hardly in a position to suffer from undue and oppressive incarceration prior to trial. But the fact is that delay in bringing such a person to trial on a pending charge may ultimately result in as much oppression as is suffered by one who is jailed without bail upon an untried charge. First, the possibility that the defendant already in prison might receive a sentence at least partially concurrent with the one he is serving may be forever lost if trial of the pending charge is postponed. Secondly, under procedures now widely practiced, the duration of his present imprisonment may be increased, and the conditions under which he must serve his sentence greatly worsened, by the pendency of another criminal charge outstanding against him.

*Hooey*, 393 U.S. at 378, 89 S. Ct. at 577 (footnote and internal quotation marks omitted).

29, 4 P.3d 654, ¶¶ 27-29 (assessing Johnson's claim that he was prejudiced by the inadequate medical treatment he allegedly received while incarcerated, and concluding that "[n]either the length nor the conditions of incarceration indicate that Johnson's pretrial incarceration was oppressive"). In particular, incarceration in facilities that are overcrowded or lacking in recreational opportunities, adequate food, climate control, proper medical care, cleanliness, or legal research capabilities may be considered in assessing whether the incarceration was oppressive. Where such conditions have been present, it is more likely that the pretrial incarceration has been oppressive. We emphasize, however, that any evidence presented concerning the conditions of the incarceration must be tied to the speedy trial inquiry; a speedy trial motion is not an avenue for pursuing grievances that are properly pursued through administrative channels or for attacking the inner workings of the prison system generally. Furthermore, it is insufficient for speedy trial purposes that the conditions of the incarceration have at times been disagreeable. The question here is one of oppressiveness, not merely occasional unpleasantness.

¶94 In sum, there is no bright-line date on which the pretrial incarceration becomes "oppressive." Rather, this determination will vary from case to case based on the specific circumstances of the incarceration.

### ii. Minimize the Accused's Anxiety and Concern

¶95 The second interest—minimizing anxiety and concern caused by the presence of unresolved criminal charges—is more subjective, not to mention difficult to demonstrate. Nonetheless, it is an interest protected by the right to a speedy trial. *United States v.*

*Marion*, 404 U.S. 307, 320, 92 S. Ct. 455, 463 (1971) (noting that one purpose of the speedy trial guarantee is " 'to minimize anxiety and concern accompanying public accusation' " (quoting *United States v. Ewell*, 383 U.S. 116, 120, 86 S. Ct. 773, 776 (1966))). As such, it is a pertinent consideration under Factor Four.

¶96  The Supreme Court has described the interest in minimizing anxiety and concern in relatively broad terms. For instance, in *Barker*, the Court pointed out that "a defendant awaiting trial on bond might be subjected to public scorn, deprived of employment, and chilled in the exercise of his right to speak for, associate with, and participate in unpopular political causes." *Barker*, 407 U.S. at 532 n. 33, 92 S. Ct. at 2193 n. 33 (citing *Klopfer v. North Carolina*, 386 U.S. 213, 221-22, 87 S. Ct. 988, 992-93 (1967)). Similarly, in *Marion* the Court observed that "[a]rrest is a public act that . . . may disrupt [the accused's] employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." *Marion*, 404 U.S. at 320, 92 S. Ct. at 463. We too have recognized economic hardship and damage to the accused's reputation in the community as types of prejudice that can flow from the presence of unresolved criminal charges. *See e.g. State v. Bailey*, 201 Mont. 473, 480-81, 655 P.2d 494, 498-99 (1982); *State v. Haskins*, 220 Mont. 199, 203, 714 P.2d 119, 121-22 (1986). " 'These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty.' " *Moore v. Arizona*, 414 U.S. 25, 27, 94 S. Ct. 188, 190 (1973) (per curiam) (quoting *Barker*, 407 U.S. at 537, 92 S. Ct. at 2195 (White, J., concurring)); *see also Hooey*, 393

U.S. at 379, 89 S. Ct. at 577 ("[A]n outstanding untried charge . . . can have fully as depressive an effect upon a prisoner as upon a person who is at large."); *Barker*, 407 U.S. at 533, 92 S. Ct. at 2193 ("[E]ven if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility.").

¶97    In evaluating the interest in minimizing anxiety and concern, therefore, the focus is on the ways in which the presence of unresolved criminal charges has disrupted the accused's life.  The court may infer from evidence of such disruption that the accused has suffered anxiety and concern, which in turn suggests that he or she has been prejudiced. However, a certain amount of anxiety and concern is inherent in being accused of a crime.  *State v. Chavez*, 213 Mont. 434, 444, 691 P.2d 1365, 1371 (1984); *State v. Van Voast*, 247 Mont. 194, 201, 805 P.2d 1380, 1385 (1991); *State v. Spang*, 2007 MT 54, ¶ 22, 336 Mont. 184, ¶ 22, 153 P.3d 646, ¶ 22.  Furthermore, the speedy trial guarantee is designed "to *shorten* the disruption of life caused by arrest and the presence of unresolved criminal charges," *United States v. MacDonald*, 456 U.S. 1, 8, 102 S. Ct. 1497, 1502 (1982) (emphasis added), not to eliminate the disruption altogether. Accordingly, the extent to which the disruption of life and the associated anxiety and concern will support a finding of prejudice will depend on their duration and intensity.  In other words, the crucial question here is whether the delay in bringing the accused to trial has unduly prolonged the disruption of his or her life or aggravated the anxiety and concern that are inherent in being accused of a crime.  *MacDonald*, 456 U.S. at 8, 102 S. Ct. at 1502; *City of Billings v. Peterson*, 2004 MT 232, ¶ 36, 322 Mont. 444, ¶ 36, 97

51

P.3d 532, ¶ 36; *see also State v. Haser*, 2001 MT 6, ¶ 34, 304 Mont. 63, ¶ 34, 20 P.3d 100, ¶ 34 (concluding that Haser's anxieties were attributable more to the nature of the crimes with which he had been charged than to the delay in commencing the trial).

### iii.     Limit the Possibility that the Defense Will Be Impaired

¶98     Finally, the third interest concerns itself with issues of evidence, witness reliability, and the accused's ability to present an effective defense. *State v. Jefferson*, 2003 MT 90, ¶ 36, 315 Mont. 146, ¶ 36, 69 P.3d 641, ¶ 36; *Haser*, ¶¶ 35, 38; *Doggett*, 505 U.S. at 654-55, 112 S. Ct. at 2692.  In *Barker*, the Supreme Court characterized this interest as "the most serious" of the interests that the speedy trial right was designed to protect, "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193.[7]  In this regard, the Supreme Court observed that "[i]f witnesses die or disappear during a delay, the prejudice is obvious" and that "[t]here is also prejudice if defense witnesses are unable to recall accurately events of the distant past." *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193. Likewise, we recognized in *Jefferson* that "time may erode the accuracy of witness

---

[7] Subsequent to *Barker*, the Supreme Court stated that " '[i]nordinate delay between arrest, indictment, and trial may impair a defendant's ability to present an effective  defense.  But the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense. . . .'  The Sixth Amendment right to a speedy trial is thus not primarily intended to prevent prejudice to the defense caused by passage of time." *MacDonald*, 456 U.S. at 7-8, 102 S. Ct. at 1502 (citation and paragraph break omitted) (quoting *Marion*, 404 U.S. at 320, 92 S. Ct. at 463).  In *Doggett*, however, the Supreme Court again stated that "[o]f these forms of prejudice, 'the most serious is [the possibility that the accused's defense will be impaired], because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.' " *Doggett*, 505 U.S. at 654, 112 S. Ct. at 2692 (quoting *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193).

testimony and exculpatory evidence." *Jefferson*, ¶ 36; *see also State v. Kipp*, 1999 MT 197, ¶ 23, 295 Mont. 399, ¶ 23, 984 P.2d 733, ¶ 23 ("The loss of a 'main witness' as a result of delay attributable to the State is prejudicial to the defense."). Thus, we stated that "this factor often carries more weight than the other bases for concluding a defendant has been prejudiced by a pretrial delay." *Jefferson*, ¶ 36; *see also State v. Good*, 2002 MT 59, ¶ 29, 309 Mont. 113, ¶ 29, 43 P.3d 948, ¶ 29 ("Impairment of defense is arguably the most important of the three factors to consider because a defendant's inability to adequately prepare his case undermines the fairness of the entire trial system."); *State v. Price*, 2001 MT 212, ¶ 28, 306 Mont. 381, ¶ 28, 34 P.3d 112, ¶ 28 (same).

¶99   Impairment of one's defense, however, "is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown." *Doggett*, 505 U.S. at 655, 112 S. Ct. at 2692-93 (internal quotation marks omitted); *see also Barker*, 407 U.S. at 532, 92 S. Ct. at 2193 ("Loss of memory . . . is not always reflected in the record because what has been forgotten can rarely be shown."). For this reason, the accused's failure to make an affirmative showing that the delay weakened his or her ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence does not preclude a finding that the defense has been impaired. Indeed, "consideration of prejudice is not limited to the specifically demonstrable," since "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett*, 505 U.S. at 655, 112 S. Ct. at 2692, 2693. Thus, "affirmative proof of particularized prejudice is not essential to every speedy trial claim." *Doggett*, 505 U.S. at 655, 112 S. Ct. at 2692.

53

¶100 Accordingly, in the absence of affirmative proof that the delay has impaired the accused's ability to present an effective defense, impairment must be assessed based on other factors in the analysis—e.g., the length of the delay (the greater the delay, the greater the erosion of exculpatory evidence and testimony), the accused's responses to the delay (the more imperiled the accused's ability to present an effective defense becomes, the more likely he or she is to complain about the delay), and the duration of the pretrial incarceration (an accused who is locked up is hindered in his or her ability to gather evidence, contact witnesses, or otherwise prepare his or her defense).[8]

### 5. Balancing

¶101 With respect to balancing, the Supreme Court explained in *Barker*:

> We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.

*Barker*, 407 U.S. at 533, 92 S. Ct. at 2193 (footnote omitted).

¶102 We have made similar observations, *see e.g. State v. Johnson*, 2000 MT 180, ¶ 14, 300 Mont. 367, ¶ 14, 4 P.3d 654, ¶ 14 ("No single factor of the *Barker* test is

---

[8] As explained above in the context of Factor One's second inquiry, both the accused and the State should address the issue of prejudice. In this regard, we clarified in *State v. Hardaway*, 1998 MT 224, 290 Mont. 516, 966 P.2d 125, that "if the State can only show lack of prejudice on one of the three traditional bases of prejudice, it must, at a minimum, address the question of whether there has been impairment of the defense." *Hardaway*, ¶ 22. We reaffirm this holding as a requirement of the State's proof under Factor Four.

indispensable or dispositive." (internal quotation marks omitted)); *State v. Highpine*, 2000 MT 368, ¶ 14, 303 Mont. 422, ¶ 14, 15 P.3d 938, ¶ 14 ("Because no single factor is by itself decisive, courts must still engage in a difficult and sensitive balancing process." (internal quotation marks omitted)), and we now reaffirm that none of the foregoing four factors is either a necessary or a sufficient condition to the legal conclusion that the accused has been deprived of the right to a speedy trial. Rather, the factors must be considered together with such other circumstances as may be relevant.[9]

¶103 As for each factor's relative importance in the overall balancing, we indicated in *Bruce* that we were adopting a method of analysis that includes features of both the "straight balancing test" and the "motive test." *See Bruce*, ¶ 54. The former "considers each of the four factors equally, and no single factor is decisive," *Bruce*, ¶ 51 (citing Brian P. Brooks, *A New Speedy Trial Standard for* Barker v. Wingo*: Reviving a Constitutional Remedy in an Age of Statutes*, 61 U. Chi. L. Rev. 587, 592-93 (1994)), whereas the latter "gives greatest consideration to the second *Barker* factor, the reason for delay," *Bruce*, ¶ 53 (citing Brooks, 61 U. Chi. L. Rev. at 610).

¶104 The right to a speedy trial, however, is "necessarily relative" and "depends upon circumstances." *United States v. Ewell*, 383 U.S. 116, 120, 86 S. Ct. 773, 776 (1966)

---

[9] For this reason, we overrule our statements to the contrary in *State v. Olmsted*, 1998 MT 301, ¶ 55, 292 Mont. 66, ¶ 55, 968 P.2d 1154, ¶ 55 ("The fourth factor of the *Barker* test, prejudice to the defendant, must be demonstrated by the defendant before there is a speedy trial violation."), *State v. Foshee*, 282 Mont. 326, 333, 938 P.2d 601, 605 (1997) ("A criminal defendant must somehow show that he or she has been prejudiced by the delay before this Court will hold that the State has violated his or her right to a speedy trial."), and *State v. Mooney*, 2006 MT 121, ¶ 17, 332 Mont. 249, ¶ 17, 137 P.3d 532, ¶ 17 ("Because we conclude that Mooney has not satisfied the prejudice prong of the *Barker* test, we decline to address the first and second prongs.").

(internal quotation marks omitted). As such, speedy trial analysis is necessarily case-specific. A defendant whose trial has been delayed twelve months due to stonewalling by the State, but who has not objected to the delay and has not been prejudiced to any significant degree by the delay, presents a markedly different claim than does a defendant whose trial also has been delayed twelve months due to stonewalling by the State, but who has repeatedly demanded a speedy trial during this period and has been prejudiced to a significant degree by the delay.

¶105 For this reason, we decline to state, as a general rule, that Factor Two (the reason for the delay)—or any other factor, for that matter—deserves the "greatest consideration" in the balancing. Rather, each factor's significance will vary from case to case, and a court assessing a speedy trial claim must weigh the four factors accordingly—i.e., based on the facts and circumstances of the particular case. For example, if the length of the delay is great enough, or if the State is sufficiently culpable in causing delay, a lesser showing of prejudice is necessary. On the other hand, if prejudice is extreme, the length of the delay required to establish a violation of the right is less. This approach, which is consistent with the "straight balancing test" (*see Bruce*, ¶ 51), best reflects the inherently case-specific nature of speedy trial claims and the reality that a given factor may outweigh all of the others in one case but be of little consequence in another.

### D. Summary of the Revised Speedy Trial Test

¶106 In sum, we are revising our framework for analyzing speedy trial claims so that it more closely tracks the balancing approach envisioned by the Supreme Court in *Barker*,

*Doggett*, and other post-*Barker* cases.  A court presented with a speedy trial claim is to analyze and then balance the following four factors.

¶107   Factor One:  The Length of the Delay.   Under Factor One, the court first ascertains whether the interval between accusation and trial is at least 200 days (irrespective of fault for the delay).  If it is not, then further analysis is unnecessary, and the claim should be denied; but if the interval is at least 200 days, then the four-factor balancing test is triggered and the court must proceed with a full analysis.  Second, the court considers the extent to which the delay (again, irrespective of fault for the delay) stretches beyond the 200-day trigger date.  The significance of this latter determination is twofold.  First, the presumption that pretrial delay has prejudiced the accused intensifies over time.  Thus, the further the delay stretches beyond the trigger date, the stronger is the presumption under Factor Four that the accused has been prejudiced by the delay.  Second, the State's burden under Factor Two to justify the delay likewise increases with the length of the delay.  Thus, the further the delay stretches beyond the 200-day trigger date, the more compelling the State's justifications for the delay must be under Factor Two.

¶108   Factor Two: The Reasons for the Delay.   Under Factor Two, the court first identifies each period of delay in bringing the accused to trial.  The court then attributes each period of delay to the appropriate party, with any delay not demonstrated to have been caused by the accused or affirmatively waived by the accused being attributed to the State by default.  Finally, the court assigns weight to each period of delay based on the specific cause and motive for the delay.  Reasons for the delay may include institutional circumstances, such as overcrowded court dockets, and "valid" reasons, such as a missing

witness. Both of these types of delay weigh less heavily against the State than do lack of diligence in bringing the accused to trial, which occupies a middle ground on the culpability scale, and bad-faith delay, such as a deliberate attempt to hamper the defense, which is weighed most heavily against the State. Weight is similarly assigned to acceptable and unacceptable reasons for delay caused by the accused.

¶109 The significance of Factor Two in the balancing process, therefore, is in the specific cause and culpability for each period of delay. The more delay caused by the State for "unacceptable" reasons (e.g., lack of diligence or bad-faith delay), the more likely the accused's speedy trial right has been violated. Likewise, the more delay caused by the accused for such reasons (e.g., to avoid being brought to trial), the less likely the right has been violated.

¶110 <u>Factor Three: The Accused's Responses to the Delay.</u> Under Factor Three, the court evaluates the accused's responses to the delay—i.e., his or her acquiescence in and objections to pretrial delays. The number of instances in which the accused acquiesces in or objects to pretrial delay is not talismanic. Rather, the court's evaluation must be based on the surrounding circumstances, such as the timeliness, persistence, and sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct (as that conduct bears on the speedy trial right), and so forth. The sum of this evaluation—i.e., the totality of the accused's various responses to the delays in bringing him or her to trial—is indicative of whether he or she actually wanted a speedy trial, which in turn informs the inquiry into whether there has

been a deprivation of the right. The evaluation also serves as a gauge of the weights the court should assign to the other three factors in the balancing.

¶111 <u>Factor Four: Prejudice to the Accused.</u> Under Factor Four, the court assesses whether the accused has been prejudiced by the delay in light of the interests that the speedy trial right was designed to protect—namely, (i) preventing oppressive pretrial incarceration, (ii) minimizing anxiety and concern caused by the presence of unresolved criminal charges, and (iii) limiting the possibility that the accused's ability to present an effective defense will be impaired. With respect to the first interest, the court considers whether the pretrial incarceration is "oppressive" in light of all of the circumstances of the incarceration. With respect to the second interest, the issue is whether the delay in bringing the accused to trial has unduly prolonged the disruption of his or her life or aggravated the anxiety and concern that are inherent in being accused of a crime. And with respect to the third interest, the court considers whether the delay has weakened the accused's ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence. However, because affirmative proof of particularized prejudice is not essential to every speedy trial claim, impairment of the defense may be evaluated based on other factors in the analysis, such as the length of the delay (the greater the delay, the greater the erosion of exculpatory evidence and testimony), the accused's responses to the delay (the more imperiled the accused's ability to present an effective defense becomes, the more likely he or she is to complain about the delay), and the duration of the pretrial incarceration (an accused who is locked up is hindered in his or her ability to gather evidence, contact witnesses, or otherwise prepare his or her defense).

¶112 <u>Balancing.</u> Lastly, the court determines whether the accused has been deprived of the right to a speedy trial by balancing each of the foregoing four factors. No one factor is dispositive by itself; rather, the factors are related and must be considered together with such other circumstances as may be relevant.

¶113 For the convenience of the bench and bar, we are providing the following outline of our revised speedy trial test.

I.      Factor One: The Length of the Delay

    A.      Is the delay long enough to trigger the four-factor balancing test?

        1.      When did the defendant become an accused?

        2.      When is the defendant's trial date?

        3.      Is the interval between accusation and trial at least 200 days?

    B.      To what extent does the delay stretch beyond the trigger date?

        1.      The presumption that pretrial delay has prejudiced the accused intensifies over time; thus, as the delay gets longer, the quantum of proof that may be expected of the accused under Factor Four decreases, while the quantum of proof that may be expected of the State under Factor Four simultaneously increases.

        2.      The State's burden under Factor Two to justify the delay likewise increases with the length of the delay; thus, the further the delay stretches beyond the 200-day trigger date, the more compelling the State's justifications under Factor Two must be.

II.     Factor Two: The Reasons for the Delay

    A.      Identify each period of delay in bringing the accused to trial.

    B.      Attribute each period of delay to the appropriate party.

        1.      The prosecution bears the burden of explaining the pretrial delays.

        2.      Any delay not demonstrated to have been caused by the accused or affirmatively waived by the accused is attributed to the State by default.

    C.      Assign weight to each period of delay based on the specific cause and culpability for the delay.

1. Bad-faith delay, such as a deliberate attempt to gain a tactical advantage or to avoid trial, weighs heavily against the party that caused it.

2. Negligence or lack of diligence in bringing the accused to trial occupies the middle ground on the culpability scale. It is weighed more lightly against the State than a deliberate attempt to hamper the defense, but it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun.

3. Delay inherent in the criminal justice system and caused by circumstances largely beyond the control of the prosecutor and the accused is "institutional delay," which is attributed to the State but weighs less heavily against the State than bad-faith delay and lack of diligence.

4. Delay for "valid" reasons, such as a missing witness or a particularly complex charged offense, is weighed least heavily of all the types of delay.

III. Factor Three: The Accused's Responses to the Delay

A. Evaluate the accused's responses to the delay—i.e., his or her acquiescence in and objections to pretrial delays—in light of the surrounding circumstances. Some considerations:

1. The timeliness, persistence, and sincerity of the objections

2. The reasons for the acquiescence

3. Whether the accused was represented by counsel

4. The accused's pretrial conduct (as that conduct bears on the speedy trial right)

B. The totality of the accused's various responses to the delays in bringing him or her to trial is indicative of whether he or she actually wanted a speedy trial, which in turn informs the inquiry into whether there has been a deprivation of the right.

C. The totality of the accused's various responses to the delays also serves as a gauge of the weights the court should assign to the other three factors in the balancing.

IV. Factor Four: Prejudice to the Accused

A. Was the pretrial incarceration oppressive, given the circumstances of that incarceration? Some considerations:

1. Duration of the incarceration

61

2. The complexity of the charged offense(s)

3. Any misconduct on the part of the accused directly related to the pretrial incarceration

4. The conditions of the incarceration

B. Has the delay in bringing the accused to trial unduly prolonged the disruption of his or her life caused by the presence of unresolved criminal charges or aggravated the anxiety and concern that are inherent in being accused of a crime? Some considerations:

1. Public scorn or obloquy; damage to reputation in the community

2. Deprivation of employment

3. Drain of financial resources or economic hardship

4. Curtailment of associations

C. Has the accused's ability to present an effective defense been impaired by the delay? Some considerations:

1. The availability of witnesses and their ability to recall accurately events related to the charged offense(s)

2. The accused's ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence

3. The length of the delay (excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify)

4. The accused's responses to the delay (the more imperiled the accused's ability to present an effective defense becomes, the more likely he or she is to complain about the delay)

5. The duration of the pretrial incarceration (an accused who is locked up is hindered in his or her ability to gather evidence, contact witnesses, or otherwise prepare his or her defense)

V. Balancing

A. Given the length of the delay, the cause and culpability for each period of delay, the totality of the accused's responses to the delay, the strength of the presumption of prejudice in the case, and the strength of the parties' respective showings on the issue of prejudice, has the accused been deprived of his or her right to a speedy trial?

B. None of the four factors is either a necessary or a sufficient condition to the legal conclusion that the accused has been deprived of the right. Rather, the

four factors must be considered together with such other circumstances as may be relevant.

### E.    Timing of the Motion and Ruling by the Court

¶114   We noted in *Bruce*, "as a practical matter, that unless a motion to dismiss for speedy trial has been made at least ten days prior to the commencement of trial, it may be difficult for the State to adequately brief the issue, and for the court to adequately consider the issue, without postponing the existing trial date." *Bruce*, ¶ 57. Thus, we stated that "any delay directly attributable to a motion to dismiss based on denial of speedy trial which is filed less than ten days prior to the commencement of trial will be assigned to the defendant." *Bruce*, ¶ 57; *see also State v. Kipp*, 1999 MT 197, ¶ 12, 295 Mont. 399, ¶ 12, 984 P.2d 733, ¶ 12 ("When a defendant files an 'eve of trial' motion, which raises a complex legal issue or requires an evidentiary hearing which thereby makes the original trial date impracticable, the *reasonable* period of delay caused thereby is attributable to the defendant.").

¶115   The negative implication of this ten-day rule is that any delay directly attributable to a speedy trial motion that is filed *ten or more* days prior to the commencement of trial will be assigned to the State. This time frame, in our view, is too short and places on the State an unwarranted amount of responsibility for a trial postponement. To be sure, it is not the accused's duty to ensure that the briefing and argument schedule proceeds in a manner that will insure that he or she is prosecuted in a timely fashion. *Kipp*, ¶ 14. However, due consideration of a speedy trial motion generally requires time for an evidentiary hearing and a careful analysis of the facts pursuant to the four-factor

63

balancing test set forth above (not to mention the time required for the parties to brief the issues fully), which cannot realistically be accomplished in less than thirty days without postponing the existing trial date.

¶116    Accordingly, we are modifying *Bruce*'s ten-day rule such that any delay directly attributable to the filing of a speedy trial motion less than *thirty* days prior to the scheduled trial date should be charged to the accused.    Conversely, any delay directly attributable to the filing of such a motion *thirty or more* days prior to the scheduled trial date should be charged to the State (as institutional delay).  We believe that this rule equitably balances responsibility for any such delay and affords the court and the parties a reasonable time frame in which to address the speedy trial motion fully.

¶117    We also stated in *Bruce* that "once a motion to dismiss for denial of speedy trial has been made, . . . it [must] be ruled upon by the district court before commencement of trial."  *Bruce*, ¶ 57.  We reaffirm this requirement and add that the court must, of necessity, enter findings of fact and conclusions of law with respect to each of the four factors *and* how the four factors were balanced against each other.  Without these findings of fact and conclusions of law, appellate review of the court's final disposition of the claim is, as a practical matter, impossible, and we will be forced to remand the case to the trial court in such situations.

¶118    With that, we now turn to Ariegwe's speedy trial claim.

## II.    Standard of Review

¶119    A court presented with a speedy trial claim must first make factual findings and then determine whether the factual circumstances amount to a speedy trial violation.  We,

in turn, review the factual findings underlying the court's speedy trial ruling to determine whether those findings are clearly erroneous. *State v. Spang*, 2007 MT 54, ¶ 7, 336 Mont. 184, ¶ 7, 153 P.3d 646, ¶ 7. The court's findings of fact are clearly erroneous if they are not supported by substantial credible evidence, if the court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been made. *Ray v. Nansel*, 2002 MT 191, ¶ 19, 311 Mont. 135, ¶ 19, 53 P.3d 870, ¶ 19. However, whether the defendant has been denied a speedy trial—i.e., whether the factual circumstances, when evaluated pursuant to the four-factor balancing test, amount to a speedy trial violation—is a question of constitutional law. *Bruce*, ¶ 18; *Spang*, ¶ 7. We review a trial court's conclusions of law de novo to determine whether the court's interpretation and application of the law are correct. *Bruce*, ¶ 18; *Spang*, ¶¶ 7, 32.

III.    **Application of the Balancing Test to Ariegwe's Speedy Trial Claim**

¶120 Although the District Court and the parties analyzed Ariegwe's speedy trial motion in accordance with the approach articulated in *Bruce*, which we have now clarified and modified in several significant respects, we find it unnecessary to vacate the court's ruling and remand this case for reconsideration in light of the clarifications and modifications set forth above. *See e.g. State v. Hardaway*, 1998 MT 224, ¶ 13, 290 Mont. 516, ¶ 13, 966 P.2d 125, ¶ 13 (remanding for reconsideration in light of *Bruce*). The factual record before us, which includes a complete transcript of the parties' arguments at the hearing on Ariegwe's motion, is well-developed, thus enabling us to evaluate his speedy trial claim pursuant to the revised speedy trial test. Moreover,

because the process by which the four factors are to be analyzed and balanced under our revised speedy trial test is substantially different from our approach under the *Bruce* test, we believe that it would be helpful and appropriate to illustrate that process for the benefit of the courts and the litigants who will be applying the test in future cases. *Cf. Bruce*, ¶¶ 59-75 (applying the approach articulated therein to the facts of that case). Accordingly, we will proceed with an analysis of Ariegwe's speedy trial claim.

## A.    Analysis of the Four Factors

### 1.    Factor One:  The Length of the Delay

¶121    The threshold question is whether the interval between accusation and Ariegwe's scheduled trial date (March 1, 2004) is at least 200 days, thereby triggering further speedy trial analysis.  The District Court found the interval to be 388 days; however, this finding was based on an incorrect determination of when the speedy trial clock began to run.  Although the court's error does not change the outcome under this threshold question (the court ultimately concluded, correctly, that further speedy trial analysis was required), it is still necessary, for purposes of the analysis below, to ascertain the correct length of the delay.

¶122    Relying on *Bruce*, ¶ 55 ("We will first consider the length of delay from *the time charges are filed* . . . until the defendant's trial date." (emphasis added)), the District Court measured from the date the State filed the original Information (February 7, 2003). However, as clarified above:

> [T]he protection afforded by the [speedy trial] guarantee is activated when a criminal prosecution has begun and extends to those persons who have been formally accused or charged in the course of that prosecution whether

that accusation be by *arrest*, the filing of a complaint, or by indictment or information.

*State v. Larson*, 191 Mont. 257, 261, 623 P.2d 954, 957-58 (1981) (emphasis added). Here, Ariegwe became an "accused" for speedy trial purposes on January 18, 2003, when he was arrested in relation to the charges subsequently filed on February 7. Thus, the interval between accusation and trial was 408 days.

¶123 The second inquiry under Factor One is the extent to which the delay stretches beyond the 200-day trigger date. Here, the delay in bringing Ariegwe to trial stretched 208 days beyond the trigger date—more than twice the amount of delay that is considered sufficiently prejudicial to trigger the speedy trial test. As a result, the State must provide particularly compelling justifications for the delay under Factor Two; and under Factor Four, the State must make a highly persuasive showing that Ariegwe was not prejudiced by the delay, while the quantum of proof that may be expected of Ariegwe under this factor is correspondingly lower.

### 2. Factor Two: The Reasons for the Delay

¶124 The issue under Factor Two is whether the justifications proffered by the State for the various periods of delay weigh for or against the conclusion that Ariegwe was deprived of his right to a speedy trial. To make this determination, it is necessary to identify each period of delay in bringing Ariegwe to trial, to attribute each period of delay to the State or Ariegwe, and to assign appropriate weight to each period of delay based on the specific cause and culpability.

¶125    First Trial Setting:  The first trial date set in this case was May 13, 2003, which the District Court selected at Ariegwe's February 20, 2003 arraignment.  This constitutes a 115-day delay (measured from January 18, 2003, the date on which Ariegwe became an accused).  The District Court attributed one of these days to Ariegwe because he had filed a request for substitution of judge on February 18, 2003.  However, the question here is one of "delay," and Ariegwe's request did not result in a later trial date.  Thus, all 115 days are attributable to the State.  This delay, however, is of the type inherent in the criminal justice system due to the court's docket and built-in requirements such as reciprocal discovery, the omnibus and status hearings, and pretrial motions.  As such, the 115 days constitute institutional delay.

¶126    Second Trial Setting:  The second trial date was September 15, 2003, which added an additional 125 days of delay.  The District Court charged 20 days of this delay to Ariegwe "as a result of the Court's scheduling accommodation of defense counsel's summer vacation."  The remaining 105 days were charged to the State "because it was caused by the State's failure to timely provide discovery to the defendant"—a finding that is supported by substantial credible evidence in the record.  Specifically, the prosecution was twice ordered to comply with § 46-15-322, MCA (requiring the prosecutor, upon request, to make enumerated items within his or her control available to the defendant for examination and reproduction)—first in the District Court's February 20, 2003 Order Setting Trial Date, Requiring Discovery, and Setting Omnibus Hearing, and second in the court's March 19, 2003 Omnibus Hearing Memorandum and Order.  However, the prosecution did not fully comply with these discovery orders.  Thus, in his

Pretrial Motions filed April 15, 2003, Ariegwe stated that he had been unable "to carry out [his] pretrial factual and legal investigation and otherwise prepare for trial." Of particular concern was the hard drive of his computer, which he believed might contain exculpatory evidence. In response, the prosecutor explained that while the computer had been seized at the time of the initial search of Ariegwe's living quarters (on January 18, 2003), a detective had not been assigned to this case. "And so rather than sending the computer over to Helena to the Department of Justice, it was sitting in Evidence."

¶127 This justification does not suggest a deliberate attempt to delay the trial in order to hamper Ariegwe's defense; rather, it suggests a combination of understaffing and lack of diligence on the part of the State. Such delay occupies the middle ground on the culpability scale, though the lack of diligence is clearly "on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun," *Doggett*, 505 U.S. at 657, 112 S. Ct. at 2693.

¶128 Accordingly, of the 125 days of delay resulting from the second trial setting, 105 days are attributable to the State as a result of understaffing and lack of diligence[10] and 20 days are attributable to Ariegwe as a result of the District Court's scheduling accommodation of defense counsel's summer vacation.

¶129 <u>Third Trial Setting</u>: The third trial date was October 27, 2003, which added an additional <u>42 days of delay</u>. This postponement was the result of the prosecutor's

---

[10] Lack of diligence weighs more heavily against the State than lack of personnel; however, while it is unclear from the record before us how many of the 105 days were due to one and how many were due to the other, the correct allocation would not change our ultimate conclusion under this Factor (explained below).

September 9, 2003 motion to continue and, thus, was attributed by the District Court to the State. As for categorizing this delay (e.g., as bad-faith, lack of diligence, institutional, or for valid reasons), the motion does not disclose the particular reason for the prosecutor's request. A postponement brought about by a motion that does not reveal the basis therefor is presumed to be unjustified and is weighed heavily against the proponent, unless evidence elsewhere in the record establishes otherwise. *See Morris v. Wyrick*, 516 F.2d 1387, 1390 (8th Cir. 1975) (assuming on a record that did not reveal the reason for the delay that there was no justifiable reason and, accordingly, weighing that delay heavily against the state). Here, the record reveals that the motion was necessitated by the State's delay in delivering evidence for testing at the crime lab. Thus, the 42 days are attributable to the State as the result of lack of diligence.

¶130 Fourth Trial Setting: The fourth trial date was November 24, 2003, which added an additional 28 days of delay. This postponement was the result of the prosecutor's October 10, 2003 motion to continue, which she filed on the ground that "the evidence in this matter is currently being tested at the Montana State Crime Laboratory, and . . . the testing will not be completed in time for the current trial setting." This delay, which the District Court charged to the State, is institutional in nature.

¶131 Fifth Trial Setting: The fifth trial date was December 8, 2003, which added an additional 14 days of delay. This postponement was the result of a sua sponte order by the District Court due to a conflict in the court's calendar. As such, it is institutional.

¶132 Sixth Trial Setting: The sixth trial date was January 5, 2004, which added an additional 28 days of delay. This postponement was the result of Ariegwe's November

70

25, 2003 motion to continue, which he filed on the ground that the parties were still waiting for test results from the crime lab. The delay, which the District Court correctly charged to the State, is institutional.

¶133 Seventh Trial Setting: The seventh, and final, trial date was March 1, 2004, which added an additional 56 days of delay. This postponement was the result of Ariegwe's December 22, 2003 motion to continue, which he filed on the grounds that he had not yet received the trace evidence report and that he needed time to review the serology and DNA report, which he had received four days earlier. The District Court vacated the January 5, 2004 trial date and scheduled a status hearing for January 22, 2004. At that hearing, defense counsel stated that he had received all crime lab reports, and the court and the parties then agreed on the March 1 trial date. In attributing this period of delay, the District Court determined that the State's failure to produce the crime lab reports in a timely manner had necessitated Ariegwe's motion to continue. Thus, the court attributed the 56 days to the State as institutional delay.

¶134 Summary: In sum, the interval between accusation and trial in this case was 408 days. Of that, 241 days are attributable to the State as institutional delay, 42 days are attributable to the State due to lack of diligence, and 105 days are attributable to the State as delay caused in part by understaffing and in part by lack of diligence, for a total of 388 days. Ariegwe is responsible for the remaining 20 days, which were the result of the District Court's scheduling accommodation of defense counsel's summer vacation.

¶135 As discussed under Factor One, the State was required to provide particularly compelling justifications for the delay in this case, given the extent to which the delay

71

stretched beyond the 200-day trigger date.  The foregoing analysis establishes, however, that 95% of the delay in this case is attributable to the State.  Significantly, more than half of the State's delay was institutional in nature (i.e., due to circumstances largely beyond the prosecutor's control), but that fact takes the State only so far, given that the primary burden to assure that cases are promptly brought to trial is "on the courts and the prosecutors," *Barker*, 407 U.S. at 529, 92 S. Ct. at 2191.  In this regard, a significant portion of the delay here was necessitated, according to the District Court, by "the State's failure to timely provide discovery to the defendant" and "the State's failure to timely produce the [crime lab] reports."  The fact that evidence seized from Ariegwe's living quarters was left "sitting in Evidence" for several months, rather than being promptly sent to the crime lab for analysis, is inconsistent with a diligent prosecution of this case.  For these reasons, we conclude that Factor Two weighs in favor of the conclusion that Ariegwe was deprived of his right to a speedy trial.

### 3.      Factor Three:  The Accused's Responses to the Delay

¶136   The focus under Factor Three is on the accused's responses to the delay, which are evaluated based on the surrounding circumstances.  The totality of the accused's responses—which is indicative of whether he or she actually wanted a speedy trial—is then balanced with the other three factors in the overall balancing.

¶137   During the time period at issue here, however, Ariegwe was operating under our *Bruce* test, which required only that the right to a speedy trial be "invoked at any time prior to the commencement of trial, either by demanding a speedy trial, or by moving to dismiss for failure to provide a speedy trial."  *Bruce*, ¶ 57.  There is no suggestion in

*Bruce*'s articulation of Factor Three that a court may infer, based on the timing of the accused's assertion of the right and the accused's other responses to pretrial delays, that he did or did not want a speedy trial. Indeed, we stated that

> there is no magical time for assertion of the right to a speedy trial which should be weighed more favorably to the defendant than some other time. So long as the defendant asserts his or her right to a speedy trial by a motion to dismiss on speedy trial grounds filed prior to the time of trial, we conclude that the defendant has satisfied the third-prong of the *Barker* test and that further analysis of that prong is not only unnecessary, but inappropriate.

*Bruce*, ¶ 48.

¶138 For these reasons, any inference that Ariegwe did or did not want a speedy trial, given the timing of his motion to dismiss on speedy trial grounds and his other responses to pretrial delays, would be of questionable accuracy. On the other hand, as explained above, we are applying the revised speedy trial test to the facts of this case to illustrate the process for the benefit of the courts and the litigants who will be applying the test in future cases, and omitting an analysis of revised Factor Three would undermine that goal. Under these circumstances, therefore, we will proceed with a full analysis of Factor Three in this case; however, we will accord little weight to this factor in the overall balancing, given that Ariegwe was operating under the mandates of *Bruce*.

¶139 We begin by noting that Ariegwe filed his motion to dismiss on January 26, 2004 (35 days before trial). However, as a general rule the mere fact that the accused filed a motion to dismiss on speedy trial grounds sometime prior to the commencement of trial is itself of little probative value on the question of whether the right has been violated. Rather, we must view the assertion of the right in the context of the case as a whole.

¶140 In this regard, we observe that Ariegwe's motion was filed on the 373rd day of the delay in this case. (Actually, he first asserted his speedy trial right four days earlier at the January 22, 2004 status hearing and indicated that a written motion would be forthcoming.) If not for the fact that he was operating under the mandates of *Bruce*, Ariegwe's waiting this long past the 200-day trigger date to assert the right would suggest that he was not particularly interested in being brought to trial sooner.[11]

¶141 Other facts in the record, however, support a contrary conclusion. For instance, during the period immediately following his arraignment, Ariegwe requested a number of discoverable items from the State (e.g., his computer hard drive, certain physical evidence, photographs taken by the police, medical records concerning the examination and treatment of K.M., the tape-recording of the conversation between K.M. and R.K., and telephone records); and when the State did not respond to these requests, which Ariegwe had made "on an informal basis," he filed his April 15, 2003 Pretrial Motions asking the court to order the State to provide the items. Such persistence in the early stages of this case appears elsewhere in the record, suggesting that Ariegwe sought to move the case along, not to delay it. Indeed, as noted under Factor Two, he was responsible for only 20 days of the 408-day delay in this case, which indicates no stonewalling on his part. Furthermore, although Ariegwe appears to have acquiesced in

---

[11] We do not mean by this that an accused must assert the speedy trial right on Day 201 or that an accused should object to every continuance requested by the prosecutor. Cooperation is essential to completing discovery matters in a timely manner. Rather, we note the timing of the motion merely as one consideration among many; it is certainly not entitled to dispositive weight.

74

some of that delay, he explained in his affidavit attached to his motion to dismiss as follows:

> I do understand that my attorneys have on three occasions requested trial be delayed. To the extent that I was consulted at all, I only consented to these delays because my attorneys convinced me delay, no matter how painful to me personally, was necessary to obtain and have the opportunity to review what might be essential evidence.

Given these circumstances, it appears that Ariegwe wanted to be brought to trial sooner rather than later.

¶142 In *Barker*, the Supreme Court observed:

> The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.

*Barker*, 407 U.S. at 531-32, 92 S. Ct. at 2192-93. Here, Ariegwe did "complain" about the State's delay in providing discovery (which necessitated the first postponement), but no additional complaints appear in the record until the January 22, 2004 status hearing—the 369th day of the delay—when defense counsel indicated that he would be filing a motion to dismiss on speedy trial grounds. While these facts would be entitled to significant weight in a case where the accused was operating under the revised speedy trial test, we accord them little weight here since Ariegwe was operating under the *Bruce* test. We simply observe that the totality of Ariegwe's various responses to the pretrial delays in this case, including his apparent reluctance to acquiesce in delay notwithstanding the advice of counsel, is consistent with a desire to be brought to trial. Thus, we conclude that Factor Three weighs slightly in favor of the conclusion that

75

Ariegwe was deprived of his right to a speedy trial, though we will accord this factor little weight in the overall balancing.

### 4. Factor Four: Prejudice to the Accused

¶143 Lastly, the issue under Factor Four is whether Ariegwe was prejudiced as a result of the delay in bringing him to trial. As explained above, a presumption that the accused has been prejudiced by the delay arises on the 200-day trigger date for speedy trial analysis (at which point it is minimal) and intensifies over time. Thus, while both parties should come forward with evidence on the question of prejudice, the court must weigh each party's evidence (or lack thereof) in light of this intensifying presumption. Specifically, as the delay gets longer, the necessary showing by the accused of particularized prejudice decreases while the necessary showing by the State of no prejudice simultaneously increases. For purposes of this case, we concluded under Factor One that the presumption had intensified to the point at which the State must make a highly persuasive showing that Ariegwe was not prejudiced by the delay, while the quantum of proof that may be expected of Ariegwe under this factor is correspondingly lower.

¶144 Prejudice is assessed in light of the interests that the speedy trial right was designed to protect: preventing oppressive pretrial incarceration, minimizing anxiety and concern caused by the presence of unresolved criminal charges, and limiting the possibility that the accused's ability to present an effective defense will be impaired. Here, the extent of Ariegwe's pretrial incarceration was four days following his arrest, which he conceded in the District Court was not oppressive. Likewise, in response to the

76

State's argument that all of the potential evidence in the case had been preserved and that all of Ariegwe's potential witnesses were available to testify at trial, he conceded that he could not point to any specific impairment of his ability to present an effective defense (though he did point out that a certain amount of impairment—e.g., dimming memories—must be presumed given the length of the delay).

¶145 Accordingly, Ariegwe emphasized the interest in minimizing anxiety and concern. In an affidavit attached to his motion to dismiss, he described numerous consequences that had flowed from the existence of the charges against him. Specifically, his being accused of sexual relations with a minor had caused tension between him and his ex-wife (with whom he shared a residence), and they had sought counseling as a result. Their oldest child had been taunted at school. Ariegwe had resigned his position as a counselor to troubled youth at A.W.A.R.E., Inc. because the charges were "so especially humiliating due to the nature of my work." He stated that the pendency of the charges was precluding him from employment in his chosen field as a youth counselor and was making employment opportunities in other fields uncertain. Lastly, acknowledging that "all defendants suffer at least some distress," he asserted that his "is particularly acute in that I live with not only the prospect of imprisonment and disqualification from my chosen employment, I also face deportation [to Nigeria]" and "loss of the society of my children."

¶146 Ariegwe attached two supporting exhibits to his affidavit. One was a December 15, 2003 letter from a licensed clinical social worker and board certified psychotherapist, who stated that Ariegwe was experiencing "moderate to at times a severe level of

anxiety." The other was a November 22, 2003 letter from Ariegwe's ex-wife, who stated that she had been having trouble sleeping at night, was fearful of what people were thinking about her and her family, and was worried about the effects the case was having on her children. She also testified to this effect at the speedy trial hearing.

¶147 Unquestionably, the experiences described by Ariegwe and his ex-wife constitute disruptions to his life, which in turn created anxiety and concern in him and his family. However, the speedy trial guarantee serves "to *shorten* the disruption of life caused by arrest and the presence of unresolved criminal charges," *MacDonald*, 456 U.S. at 8, 102 S. Ct. at 1502 (emphasis added), not to eliminate the disruption altogether. Thus, the question here is whether the delay in bringing Ariegwe to trial unduly prolonged the disruption or aggravated the anxiety and concern that are inherent in being accused of a crime. Furthermore, as the prosecutor correctly pointed out during the speedy trial hearing, the focus is on the anxiety and concern experienced by Ariegwe, to whom the speedy trial right applies; the anxiety and concern experienced by his family are relevant only to the extent that they affected the anxiety and concern experienced by Ariegwe.

¶148 In response to Ariegwe's motion and affidavit, the State took the position that the anxiety and concern cited by Ariegwe were not caused by the delay in bringing him to trial. For instance, the prosecutor argued that Ariegwe's decision to resign his position as a youth counselor was due to the nature of the charges against him, which he had characterized as "especially humiliating." Likewise, she contended that his concern about a future devoid of contact with his children was due to the possibility that he would be deported upon conviction, not the delay in bringing him to trial. She acknowledged

78

that the delay may have contributed to the strain on his relationship with his ex-wife, but she opined that this strain was due more to the nature of the charged offenses than to the length of the delay.

¶149 In response to the prosecutor's argument, Ariegwe pointed out that although some of the anxiety and concern articulated in his affidavit was either inherent in being charged with a crime or due to the nature of the charged offenses, "there's a difference between being subject to these kinds of stressors in one's life for a period of 90 days or 180 days . . . and being subjected to those stresses for a period of 380 days." The District Court, however, ultimately agreed with the State, finding that "the primary source" of Ariegwe's anxiety and concern was the nature of the charged offenses and that while the delay in bringing him to trial had "contributed somewhat" to Ariegwe's anxiety and concern, "it did not substantially aggravate it . . . to the extent warranting dismissal on that factor alone."

¶150 Ariegwe assigns error to the District Court's analysis on two grounds. First, he claims that the court erroneously required him "to apportion his anxiety and concern between the nature of the offense charged, and the delay." Such apportionment, however, is necessary, given that the speedy trial guarantee serves to shorten the disruption of life caused by the presence of unresolved criminal charges, not to make the criminal charges themselves less "humiliating" or unsettling. On the other hand, Ariegwe is correct that anxiety and concern caused by the nature of the charged offenses may be unduly prolonged in a given case. But he has not demonstrated that his anxiety and

concern were unduly prolonged in this case. Accordingly, we conclude that the District Court's apportionment of Ariegwe's anxiety and concern is not clearly erroneous.

¶151 Second, Ariegwe claims that the District Court erroneously required him to show "a demonstrable, direct effect" that the delay had on his anxiety and concern and his ability to present an effective defense. Relying on *Doggett*, he argues that "a requirement that the accused demonstrate actual, provable prejudice is inappropriate." This interpretation of *Doggett*, however, is too broad. It is true that "consideration of prejudice is not limited to the specifically demonstrable," that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify," and that "affirmative proof of particularized prejudice is not essential to every speedy trial claim." *Doggett*, 505 U.S. at 655, 112 S. Ct. at 2692, 2693. However, as explained above, the extent to which an accused may rely on presumptive prejudice depends on the extent to which the delay extends beyond the 200-day trigger date. In the case at hand, while the presumption of prejudice did operate in Ariegwe's favor by requiring the State to make a highly persuasive showing that he had not been prejudiced by the delay, the presumption was not so strong that Ariegwe was relieved entirely of making a showing of some particularized prejudice. Accordingly, we conclude that the District Court did not err in requiring a showing by Ariegwe of some demonstrable prejudice.

¶152 Proceeding, then, with an evaluation of Factor Four, we conclude that the State made the required highly persuasive showing that Ariegwe was not prejudiced by the delay in bringing him to trial. First, the State demonstrated, and Ariegwe conceded, a

complete absence of oppressive pretrial incarceration. Second, the State demonstrated that Ariegwe's ability to present an effective defense had not been demonstrably impaired. Third, the delay in this case somewhat aggravated the anxiety and concern that are inherent in being accused of a crime; however, the State demonstrated, and the District Court found, that "the primary source" of Ariegwe's anxiety and concern was the nature of the charged offenses. Taking these three considerations together, we conclude that the State's showing outweighs the presumption of prejudice established under Factor One and that Factor Four, therefore, weighs against the conclusion that Ariegwe was deprived of his right to a speedy trial.

### B. Balancing

¶153 A court assessing a speedy trial claim must balance the four factors based on the facts of the particular case and the weights assigned to each factor. None of the factors is dispositive by itself; rather, the factors are related and must be considered together with such other circumstances as may be relevant. But because the right to a speedy trial is a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.

¶154 Here, Factor One weighs in Ariegwe's favor. It establishes that a significant delay of 408 days occurred in this case. Likewise, Factor Two weighs in Ariegwe's favor, given that 95% of the 408-day delay was attributable to the State and that the record reflects a significant lack of diligence on the part of the State in providing discovery and sending evidence to the crime lab in a timely manner. Factor Three weighs slightly in Ariegwe's favor; however, we are according this factor relatively little weight in the

overall balancing, given that Ariegwe was operating under the *Bruce* test during the time period at issue here and, thus, the inferences we have drawn based on his responses to the pretrial delays in this case are of questionable accuracy. We simply observe that the totality of Ariegwe's various responses is consistent with a desire to be brought to trial. Finally, Factor Four weighs in the State's favor. Although the delay in this case somewhat aggravated the anxiety and concern that are inherent in being accused of a crime, the State made a highly persuasive showing that Ariegwe's anxiety and concern were due primarily to the nature of the charged offenses rather than to the delay in bringing him to trial.

¶155 We conclude that the State's highly persuasive showing of no prejudice (Factor Four) outweighs the extent of the delay (Factor One) and the State's culpability in causing the delay (Factor Two). We further conclude that although the totality of Ariegwe's responses to the pretrial delays in this case is consistent with a desire to be brought to trial (Factor Three), the relatively little weight we have assigned to this factor is not enough to tip the scale in Ariegwe's favor. We therefore affirm the District Court's conclusion that Ariegwe was not deprived of his right to a speedy trial.

¶156 ***Issue Two. Did the District Court abuse its discretion in denying Ariegwe's motion for a new trial?***

## I. Background

¶157 Ariegwe contends that the District Court abused its discretion in not granting his motion for a new trial. The basis of that motion was that (1) defense counsel's failure to object to allegedly improper hair comparison testimony by one of the State's experts

during trial and (2) the prosecutor's inaccurate representations of certain scientific evidence during closing arguments had denied Ariegwe a fair and impartial trial. Although the motion was specifically "premise[d] . . . on the conduct of both defense counsel and the prosecutor," Ariegwe has not renewed his claim based on defense counsel's failure to object to the hair comparison testimony. Accordingly, we will focus only on the prosecutor's closing arguments.

¶158 During trial, the State called Michelle Griffin, a forensic scientist specializing in serology and DNA analysis at the State Crime Lab. Griffin had examined a blanket seized from Ariegwe's bed and found eight stains on the blanket. One of these stains tested positive for amylase (an enzyme found in saliva), and a subsequent DNA analysis revealed the presence of multiple contributors to the stain, two of whom *could* have been K.M. and Ariegwe. More specifically, Griffin testified that K.M. and Ariegwe "cannot be excluded as contributors to that mixture" and that "there is data there present [in the stain] not associated with [K.M. and Ariegwe]."

¶159 Paraphrasing Griffin's testimony during closing argument, the prosecutor stated that the mixture of DNA found in the saliva stain, from which Ariegwe and K.M. could not be excluded,

> is consistent with the Defendant performing oral sex with [K.M.] on that bed, and body fluids mixing and running onto that blanket. And that's what they found. *Their genetic material was found on that bed, mixed together.* Right in the area where [K.M.] says this took place. [Emphasis added.]

Defense counsel did not object at this point to the prosecutor's misstatement. Rather, he pointed out during his closing argument that Griffin had testified only that K.M. and

Ariegwe "cannot be excluded" as contributors to the mixture of DNA found in the saliva stain.

¶160  During her rebuttal, however, the prosecutor again suggested that K.M.'s and Ariegwe's DNA had, in fact, been found mixed together on the blanket. Specifically, she argued that in order to buy Ariegwe's story, the jury would have to believe that 15-year-old K.M. was "so savvy and so smart" that she knew to plant forensic evidence to support a claim of rape. "It's ludicrous. She . . . knew that she needed to plant some of the Defendant's saliva with some of her vaginal fluid on that blanket in the very spot --" At this point, defense counsel did object: "That is not supported by testimony, by any evidence, as to the source of the DNA that they found. There's no evidence. There was no testimony as to any vaginal fluid." The court sustained the objection. Notwithstanding, the prosecutor then continued: "[K.M.] knew that she had to place some form of DNA substance of hers mixed in with some DNA substance of his on the blanket, at the very place where saliva is found, and she claims oral sex occurred."

¶161  Following the prosecutor's rebuttal, the judge called counsel to the bench for a sidebar conference regarding his ruling on defense counsel's objection. The judge stated that the jury had probably not heard him sustain the objection, because he had done so "under [his] breath." Since he wanted to make sure that there were no errors in the case, the judge indicated that he would instruct the jury that there was no evidence that Ariegwe's DNA had been found in any of K.M.'s vaginal fluid. The prosecutor and defense counsel agreed, and the judge then instructed the jury as follows:

84

> Before we proceed with deliberations, jurors, Mr. Sehestedt made an objection during Miss Weber's rebuttal argument that I sustained. I did that almost under my breath. I'm not sure that that was audible to you.
>
> And so that there's no confusion in this case, I'm telling you for the record right now that there is no evidence in this case that the Defendant's DNA was found in any vaginal fluid of the alleged victim in this case.

Immediately thereafter, the jurors began their deliberations.

¶162 In his motion for a new trial, Ariegwe argued that "[w]hile prosecutors have the right to suggest inferences—identified as such—which they wish the jury to draw from the evidence, they have no right to go beyond the record or make greater the weight of the evidence presented." He asserted that the prosecutor had done so in this case by making "inaccurate and untrue representations about the evidence."

¶163 The District Court agreed. In its order on Ariegwe's motion, the court observed that "the State's counsel did in fact improperly and inaccurately represent to the jury that '[t]heir genetic material was found on that bed, mixed together' " (alteration in original). The court further observed that "[t]he State's counsel then compounded the problem during rebuttal argument" when she suggested that K.M.'s vaginal fluid and Ariegwe's saliva had been found mixed together on the blanket. However, the court noted that it had, sua sponte, given a curative instruction and that Ariegwe had not requested any further clarification or curative instruction. Accordingly, the court concluded that "to the extent that State's counsel improperly or erroneously characterized the evidence to the jury during closing arguments, the error was contemporaneously cured by the Court's curative instruction."

## II.   Standard of Review

¶164 Section 46-16-702(1), MCA, provides that "[f]ollowing a verdict or finding of guilty, the court may grant the defendant a new trial if required in the interest of justice." Our standard of review of a trial court's ruling on a motion for a new trial depends on the basis of the motion. *See Giambra v. Kelsey*, 2007 MT 158, ¶¶ 24-27, 338 Mont. 19, ¶¶ 24-27, ___ P.3d ____, ¶¶ 24-27 (clarifying that our standard of review of a trial court's ruling on a motion for a new trial based on insufficiency of the evidence is de novo, not manifest abuse of discretion, given that the trial court's conclusion as to whether sufficient evidence exists to convict is ultimately an analysis and application of the law to the facts, not a matter of discretion). Here, the basis of the new trial motion is that the prosecutor's inaccurate representations of certain evidence during closing arguments denied Ariegwe a fair and impartial trial. The analysis of this claim entails an evaluation of the prejudicial effect of the inaccurate representations and the remedial value of the court's curative instruction. The trial judge, having been present throughout the course of the trial and having observed the jurors firsthand, is in a better position than are we to conduct such an evaluation. We thus will review the District Court's ultimate determinations that Ariegwe was not denied a fair and impartial trial and that a new trial, therefore, was not required in the interests of justice for abuse of discretion. *See State v. Goettle*, 253 Mont. 111, 113, 831 P.2d 595, 596-97 (1992); *State v. Staat*, 251 Mont. 1, 9-10, 822 P.2d 643, 648-49 (1991); *cf. State v. Dubois*, 2006 MT 89, ¶¶ 57-61, 332 Mont. 44, ¶¶ 57-61, 134 P.3d 82, ¶¶ 57-61. In order to establish that the court abused its discretion, Ariegwe must demonstrate that the court acted arbitrarily without conscientious judgment or exceeded the bounds of reason and, further, that the court's

abuse of discretion was prejudicial. *State v. Price*, 2006 MT 79, ¶ 17, 331 Mont. 502, ¶ 17, 134 P.3d 45, ¶ 17; § 46-20-701(1), MCA.

## III.  Discussion

¶165  In light of the District Court's finding that the prosecutor had "improperly and inaccurately" represented to the jury that K.M.'s and Ariegwe's DNA had been found "mixed together" on the blanket, Ariegwe focuses on the issue of whether he was prejudiced by the inaccurate representations.  In this regard, he argues that K.M.'s testimony alone could not have carried the State's case.  For one thing, the jury acquitted him of sexual intercourse without consent, which in his view indicates that the jurors did not fully credit K.M.'s testimony.  In addition, he points to the following argument by the prosecutor during her rebuttal argument:

> [L]adies and gentlemen, this is not a he said, she said case.  You don't need to rely only on [K.M.'s] testimony in this case.  You have photographic evidence that supports what she told the police.  You have hair evidence.  You have fiber evidence.  You have DNA saliva evidence.  You have physical evidence of injury and you have psychological evidence of injury, all of which support [K.M.'s] version of what happened on that day.

Given this argument and his acquittal on the charge of sexual intercourse without consent, Ariegwe contends that the forensic expert's testimony "played a crucial part in the state's case" and that the prosecutor's inaccurate representations about "mixed" DNA, therefore, prejudiced his right to a fair and impartial trial.

¶166  The prosecutor's inaccurate representations, however, were addressed by the District Court in its curative instruction to the jury, and we have said that "[t]he potential prejudicial effect of improper arguments may be cured when the jury has been

87

admonished not to regard those statements as evidence," *State v. Gladue*, 1999 MT 1, ¶ 31, 293 Mont. 1, ¶ 31, 972 P.2d 827, ¶ 31.  Thus, the specific issue here is whether the court's instruction was not sufficient to cure any prejudice that resulted from the misstatements about "mixed" DNA.

¶167   In this regard, Ariegwe contends that "[i]n light of the repeated representations in the state's closing, one curative instruction, following a ruling on an objection which the judge himself was unsure the jury even heard, cannot be said, with confidence, to have remedied the problem."  In response, the State contends that by instructing the jury that "there is no evidence in this case that the Defendant's DNA was found in any vaginal fluid of the alleged victim in this case," the court's instruction actually "aided" Ariegwe's defense, given that he was acquitted of the charge of sexual intercourse without consent. At the very least, the State argues, the court did not abuse its discretion in denying Ariegwe's motion on the ground that the instruction cured the prosecutor's error.

¶168   We agree with the State's latter point.  As noted above, the District Court reasoned in its order denying Ariegwe's motion that "to the extent that State's counsel improperly or erroneously characterized the evidence to the jury during closing arguments, the error was contemporaneously cured by the Court's curative instruction."  The record supports this conclusion, as does the fact that the jury is presumed to have followed the court's instruction. *See State v. Turner*, 262 Mont. 39, 55, 864 P.2d 235, 245 (1993) ("It is a well recognized principle of law that juries are presumed to follow the law as given them."); *State v. Long*, 2005 MT 130, ¶ 25, 327 Mont. 238, ¶ 25, 113 P.3d 290, ¶ 25 ("[T]he jury cannot be presumed to ignore their duties to respect the instructions of the court.").

88

Accordingly, applying our standard of review to the court's ruling on Ariegwe's motion for a new trial, we hold that he has not demonstrated that the court acted arbitrarily without conscientious judgment or exceeded the bounds of reason in denying that motion.

¶169 Before concluding this discussion, we note Ariegwe's brief argument that he was also prejudiced by the prosecutor's misstatement of testimony regarding blanket fibers found in K.M.'s underwear. Alice Ammen, an expert in trace hair and fiber examination, testified on direct examination that it was "highly probable" that K.M.'s underwear had come in contact with the blanket recovered from Ariegwe's bed. However, Ammen acknowledged on cross-examination that it was "entirely possible" that blanket fibers on K.M.'s outer garments—her socks, jeans, sweater, and blouse—had transferred to K.M.'s underwear when all of these items were placed together in a pile at K.M.'s house following the incident. Furthermore, on redirect examination, Ammen would only say that the number of blanket fibers found on K.M.'s underwear was "more indicative" of direct transfer than indirect transfer. During her rebuttal argument, however, the prosecutor stated: "The cross-contamination issue was ruled out by Alice Ammen. She told you that the fiber transfer in [K.M.'s] underwear was direct." Ariegwe objected that these statements were not supported by the evidence, but the court overruled the objection.

¶170 Ariegwe now argues that he was prejudiced by the prosecutor's incorrect statements concerning fiber cross-contamination and by the District Court's failure to sustain his objection. Yet, Ariegwe did not make this argument in his motion for a new trial. (He did mention Ammen's testimony regarding the fibers, but he did not list the

prosecutor's misstatements of that testimony as a basis for a new trial, and the District Court, therefore, did not address it.) Accordingly, the prosecutor's statements concerning fiber cross-contamination are not relevant in determining whether the District Court abused its discretion in denying Ariegwe's motion.

¶171 In sum, we conclude that the District Court did not abuse its discretion when it denied Ariegwe's motion for a new trial.

¶172 *Issue Three. Is the District Court's restitution order illegal?*

## I. Background

¶173 The District Court found that as a result of Ariegwe's offenses, K.M. and her family had sustained a pecuniary loss of $3,332.68 due to uninsured medical, counseling, and related travel expenses; that the Montana State Crime Victims Compensation Unit had incurred costs in the amount of $38.40 as partial compensation to K.M. and her family; and that K.M. and her family had incurred medical and counseling expenses that were covered by EBMS Insurance Co. in the amount of $10,863.58. The court, therefore, ordered Ariegwe to pay restitution to these victims in the specified amounts. In so doing, however, the court acknowledged that it had no information regarding Ariegwe's financial resources and future ability to pay restitution. For this reason, Ariegwe contends that the restitution requirement is illegal.

## II. Standard of Review

¶174 We review criminal sentences that include at least one year of actual incarceration for legality only. *State v. Herd*, 2004 MT 85, ¶ 22, 320 Mont. 490, ¶ 22, 87 P.3d 1017, ¶ 22. The term "legality" in this context signifies that "we will not review a sentence for

90

mere inequity or disparity." *State v. Webb*, 2005 MT 5, ¶ 8, 325 Mont. 317, ¶ 8, 106 P.3d 521, ¶ 8. Rather, our review is confined to determining whether the sentencing court had statutory authority to impose the sentence, *State v. Hicks*, 2006 MT 71, ¶ 41, 331 Mont. 471, ¶ 41, 133 P.3d 206, ¶ 41; *State v. Ruiz*, 2005 MT 117, ¶ 12, 327 Mont. 109, ¶ 12, 112 P.3d 1001, ¶ 12, whether the sentence falls within the parameters set by the applicable sentencing statutes, *State v. Seals*, 2007 MT 71, ¶ 7, 336 Mont. 416, ¶ 7, 156 P.3d 15, ¶ 7; *State v. Montoya*, 1999 MT 180, ¶ 15, 295 Mont. 288, ¶ 15, 983 P.2d 937, ¶ 15, and whether the court adhered to the affirmative mandates of the applicable sentencing statutes, *see State v. Pence*, 273 Mont. 223, 231, 902 P.2d 41, 46 (1995); *State v. Pritchett*, 2000 MT 261, ¶ 7, 302 Mont. 1, ¶ 7, 11 P.3d 539, ¶ 7; *State v. Shults*, 2006 MT 100, ¶ 34, 332 Mont. 130, ¶ 34, 136 P.3d 507, ¶ 34.

¶175 We have characterized this "legality" standard more generally as reviewing for correctness. *See State v. Megard*, 2006 MT 84, ¶ 16, 332 Mont. 27, ¶ 16, 134 P.3d 90, ¶ 16 ("This Court reviews a district court's imposition of sentence for legality only. The question is one of law and the determination is whether the district court interpreted the law correctly." (citation omitted)); *State v. Sprinkle*, 2000 MT 188, ¶ 6, 300 Mont. 405, ¶ 6, 4 P.3d 1204, ¶ 6 ("We review the district court's application of the sentencing statutes to determine whether the district court was correct."). This determination is a question of law and, as such, our review is de novo. *Seals*, ¶ 7.

## III. Discussion

¶176 As a preliminary matter, we will address the State's argument that Ariegwe should not be allowed to challenge the District Court's restitution order on appeal. The State

claims that Ariegwe "refused to cooperate [with the probation and parole officer who prepared the presentence investigation report] and therefore he cannot now benefit from his own wrong." The State cites no support for this argument in the pertinent statutes, but instead relies on *Sikora v. Sikora*, 160 Mont. 27, 30-33, 499 P.2d 808, 810-11 (1972), where we held that a surviving widow, who had pleaded guilty to the voluntary manslaughter of her husband, could not benefit from her wrongful act and share in his estate.

¶177 As Ariegwe points out, however, the State's argument is factually incorrect. When the probation and parole officer arrived at the jail to interview Ariegwe, he simply stated that he would like to consult with his attorney before meeting with the officer. He was aware that his motion for a new trial was pending at the time, and he explained that he had been trying to get a hold of his attorney for four weeks but had been unable to do so. On this record, we cannot agree with the State's assertion that Ariegwe "refused to cooperate" with the officer. Furthermore, we have been presented with no authority for the proposition that an offender is not entitled to consult with his or her attorney before meeting with the probation and parole officer. We therefore reject the State's contention that Ariegwe should be precluded from challenging the District Court's restitution order.

¶178 The sentencing statutes in effect at the time of the commission of the offense control as to the possible sentence. *State v. Tracy*, 2005 MT 128, ¶ 16, 327 Mont. 220, ¶ 16, 113 P.3d 297, ¶ 16. Ariegwe committed the crimes of attempted sexual intercourse without consent and unlawful transactions with children on January 17, 2003. Thus, the 2001 sentencing statutes apply.

¶179  Section 46-18-201(5), MCA (2001) provides that "if the sentencing judge finds that the victim of the offense has sustained a pecuniary loss, the sentencing judge shall require payment of full restitution to the victim as provided in 46-18-241 through 46-18-249." Section 46-18-242(1)(a), MCA, in turn, requires the probation officer, restitution officer, or other designated person to include "documentation of the offender's financial resources and future ability to pay restitution" in the presentence investigation report ("PSI").

¶180  In *State v. Pritchett*, 2000 MT 261, 302 Mont. 1, 11 P.3d 539, we held that the "general mandate" of § 46-18-201(5), MCA, "is subject to the detailed procedures and qualifications found in §§ 46-18-241 to 249, MCA," and that district courts "are not authorized to impose a sentence of restitution until all these additional statutory requirements are satisfied." *Pritchett*, ¶ 7. Thus, given that the PSI in that case failed to document Pritchett's financial resources and his future ability to pay restitution, we held that the district court's restitution order was illegal. *Pritchett*, ¶ 13. We reached the same conclusion in *State v. Hilgers*, 1999 MT 284, 297 Mont. 23, 989 P.2d 866, and *State v. Muhammad*, 2002 MT 47, 309 Mont. 1, 43 P.3d 318. *See Hilgers*, ¶¶ 13-14; *Muhammad*, ¶ 47; *accord State v. Dunkerson*, 2003 MT 234, ¶ 18, 317 Mont. 228, ¶ 18, 76 P.3d 1085, ¶ 18 ("Failure of a PSI report to contain documentation of . . . an offender's financial resources and future ability to pay renders a district court's sentencing of restitution illegal."); *but see* § 46-18-242(2), MCA ("When a presentence report is not authorized or requested, the court may receive evidence of the offender's ability to pay . . . at the time of sentencing.").

¶181   Likewise, in the case at hand, the PSI did not contain documentation of Ariegwe's financial resources and future ability to pay restitution.  Nor was such evidence presented at the sentencing hearing pursuant to § 46-18-242(2), MCA.  Accordingly, we hold that the District Court was "not authorized to impose [the] sentence of restitution," *Pritchett*, ¶ 7, and that the restitution order is illegal.

## CONCLUSION

¶182   We affirm the District Court's denial of Ariegwe's motion to dismiss for lack of a speedy trial.  We also affirm the District Court's denial of Ariegwe's motion for a new trial.  However, we reverse the portion of Ariegwe's sentence requiring him to pay restitution under § 46-18-201(5), MCA (2001) and remand this case to the District Court for a restitution hearing followed by resentencing pursuant to a correct and complete application of §§ 46-18-241 through -249, MCA (2001).

¶183   Affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ JIM RICE
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ JOHN WARNER

94

Justice Jim Rice specially concurring.

¶184   Because I believe the Opinion accurately interprets and states the law, I have joined it.  I write only to bemoan the law's complexity.  Incorporation of all the speedy trial factors, as previously and newly interpreted, has led herein to creation of, I fear, the "mother of all balancing tests."  The outline of the principles governing application of the factors which the Court has included in ¶113 is helpful and appreciated, and I regret only that this summary of the test requires three single-spaced pages.  I sincerely wish the best to counsel and the trial courts in working with these principles, and in making a record thereof.  I also look forward to the day when I see a seminar topic or law review article entitled "Toward a Simpler Speedy Trial Analysis."

/S/ JIM RICE


Justice Brian Morris, Justice W. William Leaphart and Justice John Warner join the concurring opinion of Justice Rice.

/S/ BRIAN MORRIS
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART